IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - - - - - - - - - - - - - - x
IN RE:                          :    **VOLUME III of III**
                                :
  GAINESVILLE ROAD              :    Case No. 8:20-bk-03888-CPM
    COMMUNITY TRUST             :              Chapter 11
                                :
  PLUM CIRCLE COMMUNITY TRUST   :    Case No. 8:20-bk-04249-CPM
                                :              Chapter 11
                Debtors         :
- - - - - - - - - - - - - - - x    U.S. Courthouse
                                     801 N. Florida Avenue
                                     Tampa, Florida  33602
                                     August 7, 2020
                                     1:38 P.M.

**TRANSCRIPT OF DAY 3 OF TRIAL**
(partially via Zoom video)

**Case No. 8:20-bk-03888:**

1-Further Hearing on Motion to Use Cash Collateral *Nunc Pro Tunc* to May 19, 2020 and Providing Adequate Protection Filed by Dion R. Hancock on behalf of Debtor Gainesville Road Community Trust (Doc. #9);

2-TRIAL on Verified Motion for an Order Confirming Termination of Automatic Stay or Modification of Automatic Stay, and to Prohibit or Condition Use of Cash Collateral Filed by John A. Anthony on behalf of Creditor One Florida Family Partners, LP (Doc. #16; Resp. 94; 110);

(...continued on next page)

**BEFORE THE HONORABLE CATHERINE PEEK McEWEN
UNITED STATES BANKRUPTCY JUDGE**

*PROCEEDINGS RECORDED BY COURT PERSONNEL.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS.*

**JOHNSON TRANSCRIPTION SERVICE**
6532 Thoroughbred Loop
Odessa, Florida 33556
(813) 920-1466

### TRANSCRIPT OF HEARING
(continued)

**Case No. 8:20-bk-03888:**

3-TRIAL on Motion to Appoint Trustee Filed by John A. Anthony on behalf of Affordable Housing Investments LLC, One Family Florida Partners, LP (Doc. #33; Resp. 92; Joinder 67; 110);

**Case No. 8:20-bk-04249:**

1-TRIAL Hearing on Motion to Appoint Trustee Filed by John A. Anthony on behalf of Affordable Housing Investments LLC, SN Capital, LLC (Doc. #11; Resp. 54);

2-TRIAL on Motion for an Order Confirming Termination of Automatic Stay Filed by John A. Anthony on behalf of Creditor SN Capital, LLC (Doc. #9);

3-TRIAL on Motion for Relief from Stay  Re: Mobile home park Filed by John A. Anthony on behalf of Creditor Affordable Housing Investments LLC (Doc. #10; Resp. 55);

4-Continued Hearing on Motion to Use Cash Collateral *Nunc Pro Tunc* to May 31, 2020 and Providing Adequate Protection Filed by Dion R. Hancock on behalf of Debtor Plum Circle Community Trust (Doc. #24).

A P P E A R A N C E S:

For Debtor
in both cases:          DION R. HANCOCK, Esquire
                        DION R. HANCOCK, P.A.
                        2803 Gulf to Bay Blvd., #209
                        Clearwater, Florida  33759
                        (727) 821-1386
                        attorneydionhancock@gmail.com

For Affordable Housing
Investments LLC,
One Family Florida
Partners, LP in
Gainesville Road;
Shawn E. Austin
and SN Capital, LLC
in Plum Circle:         JOHN A. ANTHONY, Esquire
                        NICHOLAS LAFALCE, Esquire
                        Anthony & Partners
                        100 S. Ashley Street, #1600
                        Tampa, Florida  33602
                        (813) 273-5066
                        janthony@anthonyandpartners.com
                        nlafalce@anthonyandpartners.com

For Joshua Craven
and CRG Properties
in both cases:          VINCENT F. ALEXANDER, Esquire
                        (via Zoom)
                        Lewis Brisbois Bisgaard & Smith, LLP
                        110 SE 6th Street, Suite 2600
                        Fort Lauderdale, Florida  33301
                        (954) 728-1280
                        vincent.alexander@lewisbrisbois.com

For Caleb Walsh:        DAVID KNOX, Esquire
                        KnoxLeib, PLLC
                        420 West Platt Street
                        Tampa, Florida  33606
                        (813) 251-1844
                        dknox@knoxleib.com

For U.S. Trustee:       NATHAN A. WHEATLEY, Esquire
                        (via Zoom)
                        Office of U.S. Trustee
                        501 E. Polk St., 12th Floor
                        Tampa, Florida  33602
                        (813) 228-2000
                        nathan.a.wheatley@usdoj.gov

A P P E A R A N C E S:
(continued)

Also Present:          Caleb Walsh
                       Dr. Kenneth Scheppke (via Zoom)
                       Shawn E. Austin (via Zoom)
                       Raj Baluja (via Zoom)

INDEX OF EXAMINATIONS

**Witnesses called by Debtors:**                    Page

**Caleb J. Walsh**
Redirect examination by Mr. Hancock              27

- - - - - - -

INDEX OF EXHIBITS

(No exhibits marked and admitted in this volume.)

**P R O C E E D I N G S**

1                COURTROOM CLERK:  All rise.  Court is now in

2 session.

3                THE COURT:  All right.  Please have a seat.

4                COURTROOM CLERK:  Gainesville Road Community

5 Trust, 20-3888 and Plum Circle Community Trust, 20-4249.

6                THE COURT:  All right.  I will take the

7 appearances in the courtroom first and then we will shift

8 to the video appearances, please.

9                MR. KNOX:  Good afternoon, Your Honor.  David

10 Knox on behalf of Caleb Walsh individually.

11                MR. HANCOCK:  Good afternoon, Your Honor.  Dion

12 Hancock for both Debtors.  Caleb Walsh is also present.

13                THE COURT:  Right.  Thank you.

14                MR. ANTHONY:  Good afternoon, Your Honor.  John

15 Anthony and Nicholas Lafalce, my partner, on behalf of One

16 Family, Affordable, SN Capital and Mr. Austin and Dr.

17 Scheppke and Mr. Baluja on the video.

18                THE COURT:  All right.  I see them and I

19 recognize Mr. Baluja and I think I recognize Dr. Scheppke

20 without a mask.

21                And do we also have onboard by phone Nathan

22 Wheatley?

23                (No response.)

24                THE COURT:  We're getting some feedback.  Why is

1    that?  Do you know, Ms. Martin?

2            COURTROOM CLERK:  No.  Let me ask Bill.

3            THE COURT:  Do we have any representative of the

4    United States Trustee's Office on the phone or on the

5    video?

6            COURTROOM CLERK:  I sent both he and Mr. Wilkes

7    the invite.  Let me email them.  I know Mr. Wheatley had a

8    341 today and was not going be here, but I thought Mr.

9    Wilkes was covering for him.

10            THE COURT:  We need to get somebody here from the

11    United States Trustee's Office, so standby.

12            (Discussion off the record.)

13            THE COURT:  And Ms. Martin is going to try to

14    find an attorney for the United States Trustee Nancy

15    Gargula.

16            (Brief pause in proceedings.)

17            MALE VOICE:  Your Honor (indiscernible).

18            THE COURT:  You're breaking up terribly.  I can't

19    tell who you are.

20            MR. HANCOCK:  I think it's Vincent Alexander.  I

21    think he said Mr. Wheatley may have joined on.

22            MR. WHEATLEY:  That's correct, Your Honor.

23    Nathan Wheatley for the United States Trustee.

24            THE COURT:  We're getting terrible feedback.

25    CourtCall Operator, can you figure out why?

1          COURTROOM CLERK:  They're not even on.

2          THE COURT:  Oh, so --

3          COURTROOM CLERK:  It's strictly Zoom.

4          THE COURT:  So Nathan Wheatley is on Zoom?

5          COURTROOM CLERK:  Yes.

6          THE COURT:  Well, who else was talking before Mr.

7     Wheatley was talking?

8          MR. HANCOCK:  Mr. Alexander.

9          THE COURT:  Okay.  Mr. Alexander, go ahead and

10    make your appearance.

11         MR. ALEXANDER:  I'm sorry, Your Honor

12    (indiscernible).  Vincent Alexander (indiscernible).

13         THE COURT:  Okay, this isn't working.

14         MR. ALEXANDER:  (Indiscernible words).

15         (Whereupon, Mr. Alexander hung up and dialed back

16    into the proceedings for a better connection.)

17         MR. ALEXANDER:  Your Honor, this is Vincent

18    Alexander.  Can you hear me better now?

19         THE COURT:  Much better.  Thank you.

20         MR. ALEXANDER:  This is Vincent Alexander on

21    behalf of Joshua Craven and CRG Properties.

22         THE COURT:  All right.  Thank you very much.

23         THE COURT:  Okay.  Where we left off I believe

24    that Mr. Hancock had a few questions on redirect of

25    Mr. Walsh.  And so we will ask Mr. Walsh to step into the

1    witness stand.

2              Ms. Martin, is that a fresh microphone cover?

3              COURTROOM CLERK:  Yes.

4              THE COURT:  And it's been sort of sanitized over

5    there?

6              COURTROOM CLERK:  Yes.

7              THE COURT:  Okay.

8              MR. HANCOCK:  Your Honor, before we move back to

9    that portion, I know Mr. Anthony's office filed a couple of

10   documents today.  Without getting into any details, there

11   were communications back and forth all morning up through

12   1:00 p.m.  So we had a motion set to file last night but

13   based on what we were all collectively doing, that was held

14   off until now.

15             Due to my drive and the 1 o'clock being past the

16   time I had to leave to get here on time, I would ask the

17   Court to allow me to file the motion in person.

18             THE COURT:  Certainly.  Ms. Martin, would you ask

19   Ms. Gann to print everything that was filed since Monday,

20   but not including Monday, so I can have hard copies, unless

21   she's got them already in here, let me see.

22             COURTROOM CLERK:  I would look there first.

23             THE COURT:  Pardon me?

24             COURTROOM CLERK:  I would look there first.

25             MR. HANCOCK:  Your Honor, it appears that I have

1    failed -- because I don't see it in your attachments --

2    to print off an additional copy of the attachments for

3    Mr. Anthony.

4          All I could say is they are -- the motion is very

5    simple, it's two-and-a-half pages.  The attached documents

6    relate to proof of funds being available.

7          THE COURT:  Okay.  If you want to, Ms. Martin,

8    have Ms. Gann come in and then I will ask her -- I'll

9    instruct her what to print.

10          COURTROOM CLERK:  And you want to have her make a

11   copy of the attachments?

12          THE COURT:  Yes.

13          (Ms. Gann entered courtroom.)

14          THE COURT:   Ms. Gann, there were some things

15   that were filed I guess today, or at least since Monday, so

16   I need copies of those and then there's that (indicating).

17          MS. GANN:  Okay.

18          THE COURT:  We need a copy of that, okay, the

19   attachments.

20          MS. GANN:  Okay.

21          THE COURT:  All right.  So the motion itself --

22   can I have the motion itself?

23          COURTROOM CLERK:  I handed it to you.

24          THE COURT:  I thought you handed it to -- right

25   here.

1          MR. HANCOCK:  It's only two-and-a-half pages,

2    Judge.

3          THE COURT:  Okay.  "Emergency motion for approval

4    to pay off all creditors and to provide surplus money to

5    fund related Debtor."  This is filed in the Plum Circle

6    case.  So it will only be filed in Plum Circle.  There's

7    not a companion one for Gainesville?

8          MR. HANCOCK:  It's for the surplus.  I should

9    have -- if I was going to file it, I would have, just for

10   notice purposes, so I will just put on the record.  The

11   surplus funds, Your Honor, would be roughly 167,000.  That

12   is specifically provided for in the letter of funding, that

13   it is for that.

14         So in -- well, I'll wait for Your Honor.

15         THE COURT:  All right.  Let me read this.  I'm

16   not going to mark it as filed until I get the attachments

17   back.  How much is the Affordable loan in the Gainesville

18   case, Mr. Anthony?

19         MR. ANTHONY:  Your Honor, I was just asking my

20   partner that.  I believe that it's about 350 or 398 with

21   accrued interest, not addressing attorneys' fees

22   post-petition.

23         And I believe that the SN Capital debt -- I want

24   to say it was 540, but Mr. Lafalce is looking that up now.

25         MR. HANCOCK:  I think I had it, Your Honor.  The

as-is proof claim was 605-and-change; the as-is Affordable was 398 and very small change.  The only other claim filed was 4500 even from the IRS.

From my math, if correct, it would be a total of 1,007,573.23.

THE COURT:  Okay.  Mr. Wheatley can't see what I'm reading, nor can Mr. Alexander.  It's a request to permit a payoff by permitting borrowing by Plum, apparently co-signed by Gainesville.

MR. HANCOCK:  Well, no.  Your Honor, I'm sorry. Gainesville has no signing authority.  The only obligor other than Plum, if the Court were to grant it, would be Plum.  It would then put this lender in first place.  The other guarantor would be Caleb Walsh.  It's only for the benefit of Gainesville, any residue.

THE COURT:  I see.  So there's a loan commitment letter that I haven't seen yet.  It purports to provide funding from Commercial Mortgage City Corporation to pay off all creditors of the Debtor in Plum in consideration of a first lien against the Plum property.  The amount that would be borrowed would be 1,200,000.

The total proofs of claim, to date, as Mr. Hancock said, are a little bit over 1,007,000, and Chipley has a lien in the amount of 25,000, which I assume that the Chipley lien would remain -- would keep its

1    priority?

2              MR. HANCOCK:  It would either have to keep its

3    priority or it would just be paid out as well.

4              THE COURT:  I see.

5              MR. HANCOCK:  I would think maybe they would have

6    to get paid out as a part of this in order for the lender

7    to get its position.

8              THE COURT:  The motion suggests that there will

9    result from the loan:  surplus funds after paying Plum's

10   creditors in the amount of 167,000-and-change that would be

11   available to pay the claims of Austin and Affordable in the

12   Gainesville case, albeit that may not be -- obviously is

13   not enough to retire them in full.

14             Mr. Anthony, what do you say about this proposal?

15             MR. ANTHONY:  Well, the prospect of receiving a

16   full payoff is terrific.  The numbers are 398,019.52 for

17   Affordable, 605,053.71 for SN, for a total of 1,003,073.23

18   as of June 1.  If it's a fully secured claim, then we'd be

19   seeking our interest and attorneys' fees and costs through

20   present.

21             Your Honor, the motion -- I didn't know anything

22   about this until the Court heard it.  I wasn't part of

23   anything until 1 o'clock last night except for other

24   matters.

25             The relief is requested clearly under 364.

1    There's a notice requirement under 2002.  And I don't know

2    the source of the money, I don't have the exhibits.  I've

3    emailed our clients the three-page document while we've

4    been in court, obviously exclusive of exhibits.

5           That having been said, if there is money

6    somewhere and it's being funded by a third-party lender,

7    then some of the concerns that I would have, as an attorney

8    for these folks, would be allayed because that's somebody

9    else's due diligence issue down the road.  In other words,

10   whatever entity is financing this, that's not our -- I

11   don't believe this is the Court's problem or my clients'

12   problem if somebody wants to finance this.

13          So, then we get into assuming that we get past

14   Rule 2002 and then I don't believe that there's an actual

15   invocation of 364 here, then the real question is:  Is this

16   real, is it feasible?  And, obviously, I view askance

17   anything that arise on the moment before closing arguments.

18          On the other hand, I wouldn't be so careless as

19   to turn down what might be a real source of money, even at

20   this point in time, with credibility issues being the

21   likely most prominent part of my closing.

22          So the real question would be:  Who would be

23   financing this?  How fast?  What are the considerations and

24   terms and conditions that would be required?  Because I'm

25   -- we've learned in this case not to be Pollyanna's,

1    including the investor clients that I have.

2            And so there's a lot missing here as far as "will

3    it actually happen?"  I think that kind of sums up my

4    cautious optimism.

5            THE COURT:  That is a good phrase to come out of

6    your mouth in this case.  If I were Mr. Hancock, that's

7    what I would say to myself.

8            Mr. Hancock, if this deal were to fly, then

9    perhaps I would set aside any kind of ruling on Plum for

10   another day but that would not stop me from going forward

11   on Gainesville one way or the other because there's not

12   enough money in the pot to satisfy all of the creditors in

13   Gainesville.  You understand that?

14           MR. HANCOCK:  I do, Your Honor.

15           THE COURT:  This may be equity's attempt to

16   salvage one of the two parks.  Nothing wrong with that.

17           MR. HANCOCK:  If I could have just moment?  I

18   don't need to leave, but just to talk to Mr. Walsh here

19   present for a second?

20           THE COURT:  Yes.  Go ahead and mute your

21   microphone, please.  Yeah.

22           COURTROOM CLERK:  Judge, I don't see a motion

23   filed since Monday.

24           THE COURT:  Did you file papers?

25           MR. ANTHONY:  Your Honor, we filed the request

1    for judicial notice of Marion County regulations that

2    require a permit for mobile homes to be placed anywhere.

3    And --

4               COURTROOM CLERK:  I see that but I don't --

5               MR. ANTHONY:  But I don't think there was a

6    motion.  I may be wrong.

7               THE COURT:  Okay.  Let's print that.

8               MR. ANTHONY:  Yeah, there's no other -- nothing

9    else besides that.

10               THE COURT:  Okay.  That's fine.  And I did not

11   get an order on No. 30-something in one of the cases, the

12   one with the list of the bankruptcies, unless I had already

13   entered an order, in which case then I didn't need a new

14   one.  But we talked about that one.  It was a long list of

15   bankruptcy filings.

16               MR. LAFALCE:  Yes, Your Honor.  I don't recall

17   seeing an instruction on that particular --

18               THE COURT:  I ruled on it.

19               MR. LAFALCE:  Yes, Your Honor.

20               THE COURT:  Okay.  So you can look and see if I

21   had already entered an order sometime in the past because

22   maybe it came up earlier.  But if it hadn't, put that on

23   your homework list.

24               MR. LAFALCE:  Yes, Your Honor.

25               COURTROOM CLERK:  What's the document number?

1          THE COURT:  For what?

2          COURTROOM CLERK:  What you just said.

3          THE COURT:  I don't remember.  It's 30-something,

4     it's like maybe 38, 35, and it's in --

5          COURTROOM CLERK:  Plum?

6          THE COURT:  I think it's in Plum.

7          COURTROOM CLERK:  Yeah, because that has lower

8     numbers for sure.

9          THE COURT:  It was a request to take judicial

10    notice.

11         COURTROOM CLERK:  Okay.

12         MR. ANTHONY:  And the one today is Docket 169.

13         COURTROOM CLERK:  I've got that one.

14         MR. HANCOCK:  Your Honor, I'm sorry.  I missed

15    the last part for Mr. --

16         THE COURT:  There was a motion that I ruled on,

17    on Monday, and it was a request for judicial notice with a

18    list of all these bankruptcies.  And I guess we didn't

19    specifically say "send in an order" and so I was wondering

20    if I had already entered an order sometime in the past.

21    But if not, I need to get an order to that effect.

22         MR. HANCOCK:  I know you ruled on it.  That's all

23    I remember.

24         THE COURT:  Yes.

25         MR. HANCOCK:  Judge, without again disclosing

1     anything further about what went on last night through this

2     morning at 1 o'clock, based on the motion that's filed --

3     and we're still waiting on Mr. Anthony so he can truly look

4     at that -- may we have a moment to talk outside with

5     Mr. Anthony?

6              THE COURT:  Yes.  Okay.

7              COURTROOM CLERK:  There is not an order on that

8     yet.

9              THE COURT:  Maybe I can do it right here.  Don't

10    worry about it.

11             MS. GANN:  Are you sure?

12             THE COURT:  Yeah.  This is an extra copy -- oh,

13    this is the request for judicial notice.  Okay.

14             You've got -- hold on.  Wait a minute, what did

15    you give him?

16             COURTROOM CLERK:  The attachments to the motion.

17             THE COURT:  Were they in a stapled --

18             MS. GANN:  There's --

19             THE COURT:  Plus two.

20             MS. GANN:  -- plus two.

21             THE COURT:  Okay.  I think that's good.

22             May I ask, Mr. Hancock:  What's the difference

23    between the two letters dated August 5th?

24             MR. HANCOCK:  That would've been what I just

25    failed to make three copies of the one exhibit.  You can

1    trash one of them, Your Honor.

2              THE COURT:  Okay.

3              MR. HANCOCK:  Or actually, Your Honor, if I could

4    have the one?  I believe that may be my copy.

5              (Discussion off the record with members of

6    Court's staff.)

7              THE COURT:  Thanks.

8              Okay.  I am now going to mark this as "filed in

9    open court."  And what it is, is a letter dated August 5th

10   on Commercial Mortgage City Corporation letterhead signed

11   by Jeffrey and it looks like --

12             MR. HANCOCK:  Lustbader.

13             THE COURT:  What?

14             MR. HANCOCK:  I believe it's Lustbuder -- bader

15   -- Lustbader.

16             THE COURT:  Well, his name is not typed correctly

17   underneath the signature.  It says S-t-b-a-d-a-d-e-r.

18             MR. HANCOCK:  That was his first.  Mr. Walsh

19   apparently sent me another copy with the full thing.  I

20   just know from previous emails, he's part of the exhibits

21   up to this point, Your Honor.  His name has the L-u-s-t.

22             THE COURT:  Okay.  And then there's a TIAA

23   quarterly retirement savings portfolio statement.  It

24   doesn't really say whose it is.  And the page after that is

25   a summary of your portfolio activity.

1        And then it's got another page that says "Wells

2   Fargo Advisors Snapshot, current period ending July 31,

3   2020."  It's got "WFBNA collateral account, FBO Jeffrey

4   Lustbader, REV LIV TR," which I take to mean Revocable

5   Living Trust.

6        The next page is some general instructions and

7   disclosures.  The next page is a Wells Fargo Advisors -- it

8   says "snapshot page 1 of 13."  Indeed, there are 13 of such

9   pages.  Then there's a page that says, "This page

10  intentionally left blank."

11       Then there's another Wells Fargo Advisors

12  snapshot.  I should've read the account number for the

13  first snapshot page, the last four are 4882.

14       Now I'm on the second snapshot page and that says

15  "WFBNA collateral account, FBO Jeffrey Lustbader, REV LIV

16  TR."  And the account number's last four digits are 4203.

17       There is -- the next page is "general

18  instructions and disclosures."  The next page says

19  "snapshot, pages 1 of 10," and indeed there are 10 such

20  pages that go with it.

21       Then there is -- it says Wells Fargo and it's got

22  an account number here, 8386.  It shows an available

23  balance of $150,000-and-change, along with it looks like

24  posted transactions and the next page, indeed, is a

25  continuation of that.  And the last page is likewise a

1   continuation of what appears to be posted transactions.

2           MR. HANCOCK:  Your Honor, I think I took

3   Exhibit B as really four separate or put-together documents

4   of the lender.  The first one, just so we have it in the

5   record, what I took from it, the first document had

6   $879,439.64 in it.  The next account had $165 -- I'm sorry

7   -- $165,777.73.  The third had $152,193.42.  Adding those

8   three up, I got a grand total of $1,197,410.79.  The last

9   attachment then has an additional $150,217.12, which puts

10  it at roughly 1.347.

11          THE COURT:  Okay.  Let's see where we get today.

12  If I find against your clients, then this may be

13  interesting and a basis upon which to make an offer to a

14  Trustee.  If I find in favor of your clients, we can

15  discuss it more.

16          But I wonder why somebody -- and I don't know if

17  this guy has accounts all over the place -- but why he

18  would pull $800,000 out of his retirement account -- or

19  almost $900,000.  So I need to know who is this Jeffrey

20  Lustbader, why is he apparently denuding himself of all

21  available cash and liquid assets maybe -- I don't know,

22  maybe he has a lot of other accounts.

23          MR. HANCOCK:  Sure.  Your Honor, all I can speak

24  to is --

25          THE COURT:  All I'm saying is:  Who does that?

1          MR. HANCOCK:  It's unique, Your Honor, but unique

2     things happen.  That's how businessmen get to be famous or

3     do whatever they do.  I just know Mr. Lustbader's name -- I

4     can't speak or say he's actually a broker but that's my

5     take.  And at the end of what he does, he puts lenders

6     together with borrowers.  He was always a part of getting

7     Silver Hill Funding which was all but set in April of 2019.

8          And the last thing, Your Honor, as to

9     Gainesville, Affordable is a creditor of both.  So if

10    398,000 went away from Plum, it would also go away from

11    Gainesville.  It's one debt where they're both linked to

12    that, which would bring the total for Gainesville to

13    1.9 million-and-change.

14          The last thing, Your Honor is, based on this,

15    would the Court entertain a couple of minutes to speak to

16    Mr. Anthony?

17          THE COURT:  Certainly.

18          MR. HANCOCK:  Thank you, Your Honor.

19          THE COURT:  Let me -- I like to look down the

20    road a little bit.

21          MR. HANCOCK:  Yes, Judge.

22          THE COURT:  Because I left open the possibility

23    that we could set aside Plum if I were to rule that there's

24    a Trustee and there would be no problem with that.  I need

25    to sort of walk that back a little bit.

```
 1            Depending on what the findings are, the findings
 2    regarding Gainesville may also be a disqualifier as to
 3    Plum, depending on what they are.  They're not -- there are
 4    some discrete issues that just pertain to one park or the
 5    other, sure.  But then there are some others that are
 6    cross-overs.
 7            MR. HANCOCK:  Understood, Judge.
 8            THE COURT:  So go talk.
 9            MR. HANCOCK:  Thank you, Judge.
10            THE COURT:  Try to stay six feet away from each
11    other.  You can go out in the hallway and line up.
12            (Pause in the proceedings from 2:12 p.m. to
13    2:21 p.m.)
14            THE COURT:  Okay.
15            MR. HANCOCK:  All right.  Where we are at this
16    moment is, without getting into any of the terms that would
17    affect anything here with that, what we were doing
18    throughout the night, as well as up until 1 o'clock
19    with the back-and-forth with additional counsel beyond
20    Mr. Anthony's office, for that purpose only, that attorney
21    had not made his notice of appearance.  He is on the phone
22    now attempting to be with Mr. Baluja and Mr. Scheppke.
23    Again, I know this is --
24            THE COURT:  He's a doctor and you call him mister
25    a lot.
```

```
 1            MR. HANCOCK:  I'm sorry.

 2            THE COURT:  And so let's call him doctor.

 3            MR. HANCOCK:  So, that is -- the attorney is

 4    Brent Friedman so he is on the phone I believe with one or

 5    both of them now.  So I'm not trying to delay, we're ready

 6    otherwise, but I can see them both sitting right there.  I

 7    don't know if he was able to get in touch with them.  I

 8    know that Mr. Anthony was able to communicate with them.

 9            So I'm just putting that out again for Your Honor

10    that it looks like everything could be globally taken care

11    of without another three hours of --

12            THE COURT:  How globally?

13            MR. HANCOCK:  Everything.  There would be nothing

14    left.  It was there -- again, without getting into terms,

15    it was there today not even considering the 1.2 of the

16    financing that we just filed.  That wasn't a part of it but

17    now we've added that onto it.

18            So at this point, Mr. Friedman is just trying to

19    get in touch with Mr. Baluja and Dr. Scheppke.

20            MR. ANTHONY:  So, Your Honor, this is all very

21    interesting to me and I'm sure to you, coming as it does,

22    Friday afternoon, at least eight hearings, including other

23    hearings that were properly brought under 364.

24            My concern, based upon what I've heard now over

25    the last half an hour, is that we don't really have
```

1   anything specific here.  And there are many times in the

2   course of a Chapter 11 when you think you might have

3   something to tell the Court, but you don't know enough to

4   be able to file a motion.

5        What has happened with the paper that you have

6   in front of you, the filing that you have in front of you

7   -- I think it's Docket 170 -- is that they thought they

8   might be able to get a loan.  And so they filed the motion

9   prematurely because they need to now, in order to put off

10  the rest of the hearing.

11       And I don't want to artificially squelch

12  something that might be real, and I don't think there's a

13  high probability of that, but my main concern -- my main

14  thought is this.

15       Bankruptcy Code Section 1109 relates to the right

16  to be heard and Section (b) lists a group of parties that

17  are parties-in-interest.  And I am here representing three

18  creditors.  There's equity on the phone, there's the

19  Debtor.  If our client gets paid off in connection with a

20  motion to dismiss and they get their balances and pay off

21  the debt before the U.S. Trustee has picked a Trustee,

22  that's fine, then I don't have a right to be heard.

23       But at this point in time, Your Honor has put an

24  enormous amount of judicial effort over the last 10 weeks

25  into this case and it would be unfair for a half-written

1     motion and a half-closed deal.  Whoever was talking at

2     1 o'clock, I guarantee it wasn't us.

3              And I'm sure Mr. Friedman is a good man and a

4     great transactional lawyer and all of that, but for this to

5     unfold when we could be doing our closing arguments or any

6     final questions of Mr. Walsh, to me, I'm concerned about

7     the judicial economy here.  And in the event that something

8     obviates the necessity for appointment or if dismissal

9     truncates -- or a payoff truncates the 11, then I don't

10    think that I'll have a dog in the hunt.  But, that, I don't

11    think should be permitted to reorder the afternoon.

12              THE COURT:  Okay.

13              MR. HANCOCK:  Your Honor, if could -- one point.

14              THE COURT:  We're going forward.  We are going

15    forward; okay?  If it turns out that there is a Trustee

16    appointed for both of these estates, anybody's money, so

17    long as it's traceable to good money, is welcome to pay off

18    the creditors and for equity to regain control, if it comes

19    to that.

20              So let's go ahead and finish up.  You've got a

21    few items of redirect for Mr. Walsh.  We'll have Mr. Walsh

22    return to a familiar spot.  It's not easy being a witness

23    and being the primary witness, it's grueling.

24              COURTROOM CLERK:  Raise your right hand.

25              (The witness was placed under oath by the

1    Courtroom Clerk, and testified as follows.)

2              THE COURT:  You may go ahead, Mr. Hancock.

3              MR. HANCOCK:  Thank you, Your Honor.

4         **CALEB JOHN WALSH - REDIRECT EXAMINATION**

5    BY MR. HANCOCK:

6    Q    Mr. Walsh, I don't know if you just said your name or

7    not, can you go ahead and tell -- reintroduce yourself to

8    the Court?

9    A    Yes.  My name is Caleb John Walsh.

10   Q    All right.  And are you the Trustee of both Plum

11   Circle Community Trust and Gainesville Road Community

12   Trust?

13   A    Yes, I am.

14   Q    You talked at some length, in direct questioning from

15   Mr. Anthony as well as questioning from the Court and

16   creditors' counsel and then with cross from myself, about

17   funding and your efforts to try to move this case along

18   and, in prior to moving the case, to try to pay it off; is

19   that correct?

20   A    That's correct.

21   Q    Now we're here, you've heard from one of the

22   creditors, to date, as a witness in this trial.  We talked

23   about your plan moving forward, the new units, so forth and

24   so on.  You recall all of that?  It's been, again, over the

25   last --

1    A    Yes, I do.

2    Q    -- week or two.  Are you planning, as the Trustee of

3    the two parks, to pay off all of the debts?

4    A    Yes.

5    Q    Is there any exception to that?

6    A    The one exception would be with One Family Florida

7    Partners and I've hired special counsel to deal with that

8    claim.

9    Q    All right.  Now let's talk about the appraisal that

10   was done.  You were present when Mr. Scroggie testified.

11   A    That's correct.  The appraiser for the opposing side,

12   that's correct.

13   Q    And you heard him say there were no financials

14   provided?

15   A    That's right.

16   Q    Did Mr. Scroggie contact you and your staff to set up

17   the appraisal dates and times?

18   A    So we had to let Mr. Scroggie onto the property.  It's

19   part of my management that we don't just allow anybody to

20   walk through, they would be -- you know, we need to find

21   out that they're either a resident or a guest of the

22   resident.  And when Mr. Scroggie came onto the property, he

23   had to get permission.  He asked us.  We talked with him in

24   my office briefly and, you know, he just -- I think he

25   asked if there was going to be any plans to connect to

1    public utilities, a few questions like that.

2    Q    And you hired -- on behalf of the Debtors, you hired

3    another appraiser; is that correct?

4    A    That is correct.

5    Q    Was that appraisal done?

6    A    It was.

7    Q    And did that appraiser ask for financial information?

8    A    Yes, he did.

9         MR. ANTHONY:  Objection, Your Honor.  Hearsay.

10        THE COURT:  Yes.

11   BY MR. HANCOCK:

12   Q    Did you provide financial information to the appraiser

13   that you hired?

14   A    Yes, I did.

15   Q    And as far as you know, from reading the report and

16   just from your general information of the amount that came

17   back, was that financial information used?

18        MR. ANTHONY:  Objection, Your Honor.  Leading.

19        THE WITNESS:  Yes, it was.

20        THE COURT:  Wait a  minute.  What's the

21   objection?

22        MR. ANTHONY:  Leading.

23        THE COURT:  I'll let it go.  Overruled.

24   BY MR. HANCOCK:

25   Q    Mr. Walsh, are you aware of whether or not that

 1    financial information was used?

 2    A    So, with my appraiser that I retained to do an

 3    appraisal of the property, that financial data was used.

 4                MR. HANCOCK:  Nothing further, Your Honor.

 5                THE COURT:  All right.  Those are your redirect

 6    questions?

 7                MR. HANCOCK:  Yes, Your Honor.

 8                THE COURT:  That's it?

 9                MR. HANCOCK:  That's it, Your Honor.

10                THE COURT:  Okay.  I have one and it doesn't

11    follow on that at all.  But I'm the judge and I'm asking

12    it.

13                How much did Shawn Austin pay for those mobile

14    homes?

15                THE WITNESS:  I believe $19,000, Your Honor.

16                THE COURT:  In cash?

17                THE WITNESS:  Yes.

18                THE COURT:  All right.

19                THE WITNESS:  And just to specify that, I mean, I

20    think he paid with a check.  But, yes, he --

21                THE COURT:  Okay.

22                THE WITNESS:  Yes.

23                THE COURT:  The check cleared?

24                THE WITNESS:  Yes, it did.

25                THE COURT:  All right.  All right.  You don't

1    have any re-cross based on that limited redirect, do you?

2              MR. ANTHONY:  No, Your Honor.

3              THE COURT:  I didn't think so.  All right.  It

4    looks like you're done.  Thank you.

5              (Witness steps down.)

6              THE COURT:  Okay.  I think all the exhibits --

7    we've already done the housekeeping on that.  I have all of

8    the Movants in except for some limited exceptions within

9    Exhibit 12 in evidence.

10             I have, on the Debtors' side of things, I have

11   all of the exhibits in evidence that were marked for

12   identification with the exception of 16 and 17 which are

13   appraisals and No. 20, which is a compilation of some sort

14   of invoices and receipts.  That one, No. 20, did not come

15   in and, furthermore, it's the subject of a motion to strike

16   that I granted.  That's what I have as the record.

17             Do you all want a few minutes to look at the

18   exhibits and publish anything you think was not fairly

19   brought to my attention during the course of the trial on

20   your respective lists?

21             MR. HANCOCK:  Yes, Your Honor, just a moment.

22             THE COURT:  Yes.  Take a little bit of time.

23   Because how long will it -- well, I should ask.  How long

24   are you going to go on your -- well, Mr. Anthony is first.

25             How much time are you going to consume for

closing argument?

MR. ANTHONY:  Your Honor, I think you should shut me off at 30 minutes.  I'm going to try to keep it to 30 minutes.

THE COURT:  Okay.  So I should get my hook out?

MR. ANTONY:  Absolutely.

THE COURT:  All right.  You know, if you don't use big words like Procrustean, your presentation will go faster because there are fewer syllables.

MR. ANTHONY:  I'll try to advance what might otherwise be a phlegmatic presentation.

THE COURT:  Okay.

MR. HANCOCK:  Your Honor, I don't expect to go beyond 20, 25 at the most.

THE COURT:  Okay.  Let's allocate a half and a half hour for both sides.  And so then that would -- if we were to start at 3:00, we would end at 4:00.  And then I could put together some notes, after I hear what you all say, make a ruling before 5:00.  Is that fine?

MR. HANCOCK:  Yes, Your Honor.

THE COURT:  Okay.  Then take --

COURTROOM CLERK:  Excuse me.

THE COURT:  Yes, ma'am?

COURTROOM CLERK:  I just wanted to tell you also that I uploaded Exhibit 140 and 141 to the docket already.

1      THE COURT:  What are those?

2      COURTROOM CLERK:  They came in on the 3rd.

3      THE COURT:  Oh, yes.  Okay.  All right.  Thank

4  you.  All right.

5      So go ahead and take until 3 o'clock and look

6  through your exhibits, see if there is anything you want to

7  publish.  And for Mr. Walsh's benefit, and those on the

8  video who are clients, "publish" just means that they

9  profile certain texts that are within the document; okay?

10      (Recess taken from 2:34 p.m. to 3:05 p.m.)

11      COURTROOM CLERK:  All rise.  Court is now in

12  session.

13      THE COURT:  Please have a seat.  All right.  So

14  let me ask Mr. Anthony, anything you would like to publish,

15  in particular?

16      MR. ANTHONY:  Yes, Your Honor, a brief list.

17      THE COURT:  Okay.

18      MR. ANTHONY:  Start with Exhibits 127 and 128

19  which are in the two appraisals and, in particular,

20  focusing on the photographs of the park.  Exhibit No. 14,

21  which is the Sunny Oaks rent roll, make reference to that.

22      There are the Shawn Austin documents and

23  judgments, Exhibits 52 through 58, they're all very short

24  documents.

25      There's the $350,000 Affordable note and

1    mortgage, Exhibits 10 and 11.

2            There is the email to Mr. Craven about the deal

3    for Plum at 800,000.  There's the closing statement.  And

4    by the way, that's Exhibit No. 140.  There's the closing

5    statement from the same deal, as it ultimately went down,

6    at 98.

7            THE COURT:  So 140 and 98 go together?

8            MR. ANTHONY:  Yes, Your Honor.

9            THE COURT:  Okay.

10           MR. ANTHONY:  Then there's the Fort Bragg

11   operating agreement, 141.

12           THE COURT:  141?

13           MR. ANTHONY:  Yes.

14           THE COURT:  Uh-huh.

15           MR. ANTHONY:  The cash rents email from Parks

16   Management, Exhibit 19.  There's the video that we began

17   direct examination of Mr. Walsh with, Exhibit No. 139.  And

18   there is the permit filing of today, I think it's Docket

19   No. 169 and 109 in the respective two cases.

20           THE COURT:  Wait a minute.  169 and 109 both have

21   to do with permits?

22           MR. ANTHONY:  It's the request for judicial

23   notice and --

24           THE COURT:  Got it.

25           MR. ANTHONY:  Yeah.

1          THE COURT:  Okay.  Now 127 and 128, there are two

2     appraisals?

3          MR. ANTHONY:  Your Honor, I think there's two

4     appraisals.  One is on the Plum and the other is on the --

5          THE COURT:  Oh, right.

6          MR. ANTHONY:  -- Gainesville too.

7          THE COURT:  Yes, of course.  Okay.  All right.

8     And did you say 14?

9          MR. ANTHONY:  14 is the rent roll for Sunny Oaks,

10    showing -- it's the current rent roll for Sunny Oaks,

11    showing Mr. Austin as among the current tenants.

12          THE COURT:  Okay.  It seems like every single one

13    of these are ones that I've already seen.

14          MR. ANTHONY:  Oh, yeah.  The idea is those are

15    the only ones I'm going to be referring to in closing.

16          THE COURT:  Okay.  So, in terms of anything else

17    in these binders, you don't think I need to read anything

18    after I hear what you have to say.

19          MR. ANTHONY:  Correct.

20          THE COURT:  Okay.  So be it.  Okay.  All right,

21    Mr. Hancock, what would you like to publish?

22          MR. HANCOCK:  Your Honor, I guess we think

23    differently.  Just to focus on, I'll just give you the

24    numbers, if that's okay, to make it quicker?

25          THE COURT:  Go ahead, yeah.

1          MR. HANCOCK:  Okay.  Exhibits 2, 3, 4, 7, 8, 9,

2     18.

3          THE COURT:  Okay.  One moment.  Let me get out

4     from underneath these notebooks.

5          So you want me to look at, let's see, Marion

6     property appraiser detail, permit, a contract addendum, the

7     trust agreements --

8          MR. HANCOCK:  No, the next one, Your Honor.

9          THE COURT:  Wait, strike that, strike that.  The

10    Raj Baluja agreement and checks, Adam Fish letter and

11    operating agreement, and 18 is the new agreement/Baluja.

12         MR. HANCOCK:  Yes.  And also 9, Your Honor.

13         THE COURT:  Oh, I skipped over that, Department

14    of Environmental Protection email.  Okay.  And you don't

15    have those in a paper notebook; right?  I mean, I can call

16    them up right here, I've got them on the computer.  I

17    didn't know if you had a little throwaway binder.  Because

18    I can also ask Ms. Martin to ask --

19         MR. HANCOCK:  I think I do, Your Honor.

20         THE COURT:  Are they extras or do you need to

21    refer to them?

22         MR. HANCOCK:  No, I don't need them myself, Your

23    Honor.

24         THE COURT:  Because I can have Ms. Gann print

25    them out.

1          MR. HANCOCK:  May I approach, Your Honor?

2          THE COURT:  Yes.

3          MR. HANCOCK:  I believe this is it.

4          THE COURT:  Thank you.  I did not allow

5   Mr. Alexander to indicate if he wanted to ask any questions

6   after the redirect and I did not ask Mr. Wheatley if he

7   did.

8          Mr. Alexander, did you have anything you wanted

9   to ask Mr. Caleb [sic], based on what Mr. Hancock asked

10  him?

11         MR. ALEXANDER:  Vincent Alexander.  No, Your

12  Honor, I had nothing to say on that.  Thank you.

13         THE COURT:  All right.  Mr. Wheatley?

14         MR. WHEATLEY:  Thank you, Your Honor.  Nathan

15  Wheatley, United States Trustee.  I did have no questions

16  based upon that redirect.

17         THE COURT:  All right.  Thank you.  Okay.  Then

18  let's have Mr. Anthony rise and give us the closing

19  argument for his group of creditor clients.  Go.

20         MR. ANTHONY:  Thank you, Your Honor.  As we deal

21  with the current economic circumstances and so many

22  innocent and unfortunate corporate debtors are on the

23  threshold of this courthouse, it kind of reminds us of the

24  Great Recession and all the innocent, unlucky, sometimes

25  over-exuberant, business people who took risks and were

1    certainly not rewarded.

2        The concept of Chapter 11 and the opportunity to

3    reorganize is of constitutional proportions.  With that,

4    goes the requirement of good faith and the oft-repeated

5    maxims that bankruptcy and the fresh start are for an

6    honest debtor and it is not supposed to be a head start or

7    unfair start.

8        The fishbowl of Chapter 11 and the creditor

9    democracy and the concept of full and fair disclosure is

10   hand-in-hand with the automatic stay and the opportunity to

11   reorganize.  And in this context, what we have is a

12   scenario where the Debtor-in-Possession is not deserving of

13   the right to do that alone because the Debtor's management

14   is incapable of fulfilling its duties under 1107.

15       I want to deal with two threshold points that

16   are, to me, the most important ones that came up early in

17   evaluating Chapter 11 Trustee relief.  The first was:  Is

18   this one Debtor or both Debtors?  And I want to say that

19   it's both Debtors, regardless of the side detour that we

20   took during the first hour today.

21       Mr. Walsh has said from the witness box that he's

22   considered these two companies to be the same.  It may be

23   that that was not legally appropriate, but we know that it

24   happened.  And we know that, for example, Plum Circle is

25   guaranteeing the debt and hypothecating its assets to

1    secure funds that at least allegedly were supposed to be

2    incurred for the benefit of Gainesville.

3         We think that it's important that the two cases

4    be considered as one and that any misconduct allocable or

5    attributable to one case be relevant for both.  And, in

6    point of fact, 1104(a)(1) speaks directly to that when it

7    said "or similar case."  It doesn't just talk about pre and

8    post-petition mismanagement, it talks about mismanagement

9    in a similar case.  And so these two cases are, to say the

10   least, very similar and they're mobile home cases with

11   overlapping creditors and overlapping misconduct.

12        The second big issue related to -- and the

13   Trustee had vetted the issue and certainly I had had to

14   speak with very disparate clients about the issue of

15   funding a Chapter 11 Trustee.  And our clients not only

16   rose to the occasion but, additionally, had me draft -- and

17   in a draft, we didn't solicit because there was no

18   Disclosure Statement, can't ask for that -- but what a Plan

19   might look like if a Trustee were appointed, leading to the

20   termination of exclusivity.  And it was contemplated that a

21   fiduciary would step in and stabilize rents where tenants

22   might've had no faith previously and get to the bottom of

23   claims and allegations in various directions.

24        And it's telling that our clients, even though

25   you've heard that from the witness box, Mr. Walsh has said

1    that he planned on filing a lawsuit against Dr. Scheppke.

2    We never heard that before until he testified that from the

3    box.  He said that he's going to file a counterclaim

4    against Mr. Baluja.  Well, the Chapter 11 Trustee is free

5    to do all of that.

6            He talked about evicting or said that he had

7    already evicted Mr. Austin.  Well, everything is on the

8    board when you get in a fiduciary.

9            They looked at that with their eyes open.  They

10   said:  Yeah, we're prepared to deal with the expense rather

11   than having a Debtor-in-Possession who doesn't seek

12   compensation but harms the estate.  We would rather get

13   something for something.

14           Now with those two issues having been addressed,

15   Your Honor recalls how the case -- how the evidentiary

16   hearing started.  It started with a video of Mr. Walsh and

17   that video was played for the express purpose of

18   illustrating -- we could've picked any one of 27 that I

19   found and watched -- but we picked one where it's pretty

20   clear that he's going out and soliciting investors.  He can

21   call them what he wants, but he's soliciting investors and

22   he got some investors.

23           My client -- you know, we don't have to prove a

24   10(b)(5) claim here and material misrepresentation.  It's

25   an 1104 hearing, we're not dealing with the 33 Act, or the

1   34 Act, or the 40 Act or all of those issues, but we know

2   what's going on.

3          And so we listened to that video because the

4   gentleman presented himself as an expert.  He presented

5   himself as an authority.  He presented himself as "how to"

6   and a strategic investor and advisor.  And the reason for

7   that is because of the delta between what he promises --

8   and you heard him testify he has 4,000 doors.  We don't

9   know what they're connected to but 4,000 doors.  And that

10  delta is very, very significant when you get to the only

11  bankruptcy case, the only deals that we know about.

12         It was his hearing as much as it was ours.  He

13  could've come in here and told us something about any

14  mobile home park that he's ever had that worked.

15         So, that delta between what he represents and

16  what -- the whole rest of what you've seen today, has only

17  two explanations.  The delta either comes from the fact

18  that he has grossly mismanaged these parks, even though he

19  is totally competent, as he's represented, or that he has

20  totally defrauded our clients.

21         And we don't have to prove one or the other for

22  purposes of 1104(a)(1).  We may have to at some point, and

23  that's anticipated, but let's go to 1104(a)(1).

24         Fraud and dishonesty fall into one batch, if you

25  will.  Incompetence and gross negligence lack the scienter,

or the intent, but they're pretty bad.  And what the courts

have found, and SunCruz is a perfect authority -- that I

believe is a Judge Hyman case -- for the proposition that

there is no discretion under 11(a)(4) -- I'm sorry --

1104(a)(1).  If you find anything in the list of

1104(a)(1), then appointing a Trustee is mandatory.

And what are the elements -- or what do the cases

say about what falls into mandatory, what sort of conduct

beyond these categories?

The Colby case talks about books in disarray.

Your Honor didn't even see something that purported to be

books until the last day of hearing and those books didn't

match the basic requirements of business records exception

under 803(6), so you disallowed them.  And it's not that

the Court didn't give them an opportunity.  We were very

rapid in the gates of articulating our concern that they

have no business records.  They could have hired somebody.

You heard Mr. Hancock extraordinarily capable in

dealing with what he has.  He knew what he needed, he knew

the first week of the case that he needed to come in here

with a forensic accountant, with the accountant for the

companies, open the books and his client did not do that.

Instead, the bankruptcy schedules were messed up, the

tenants didn't get notice, the tenants again didn't get

notice, the first meeting of creditors, didn't attend one

of them after he attended the other.  Then there were

problems with telephones and with time zones and all those

things that people who have 4,000 doors know better than to

miss.  It shows an utter disregard for the system.  And so

disarray of books, that's Colby.

You have Judge Walrath in the PRS case talks

about diversion of corporate assets.  Once again, counsel

has known what he has to do and he's very capable.  He

could have, if he had the answers from his client.

We have never gotten the answer to what the rent

-- gross rents were from Plum from the beginning of the

acquisition and we know that there's 560,000 of gross rents

from Gainesville and we don't have any sense as to where

the money went.  All we know is that it went into something

that isn't named, that isn't a Debtor bank account called

Parks Management.  So, that's what PRS says about that.

Paolino is another case where we talked about

prepetition financial records justifying postpetition

relief under 1104.  And, again, Paolino talks about books

and records that don't match up.  They didn't talk about

complete non-production of them or producing heavily

redacted records from the accounts in question.

The Marvel case I think is important because it

says that the list is not exhaustive, it's illustrative.

So, what I take when I read those five cases I see

1    1104(a)(1) saying that this Court has no discretion

2    regarding appointment of a Trustee if they find books in

3    disarray, diversion of corporate assets, pre-petition

4    financial records that show problems, or anything else that

5    fits into a non-existent -- non-exclusive list of things

6    that show either fraud and dishonesty or incompetence and

7    gross negligence.

8          And, remember, every time Mr. Walsh has testified

9    attempting to say that he is not engaged in fraud, he's

10   basically admitting to gross negligence.

11         Now under 1104(a)(2), the best interest of

12   creditors, well that's different and it's a lower and

13   more flexible standard.  Best interest of creditors, equity

14   and other legitimate interests, it's interesting, we have

15   Mr. Austin with an equitable lien.  He spent $41,000 fixing

16   up what he paid 17,000 for.  He's got a judgment.

17         Under anybody's reckoning, it still hasn't been

18   appealed.  Mr. Walsh didn't even show up for the hearing.

19   It was a default judgment.  But it was on his unsuccessful

20   eviction case.  And so he's a creditor with an equitable

21   lien.  He weighs in for Chapter 11 Trustee.

22         We have arguably an under-collateralized

23   Affordable with a junior lien comes in the same.

24         Mr. Baluja, a disputed -- they say it's a

25   disputed claim.  It's presumptively valid.  We filed the

proof of claim.  Nobody bothered to object to it.

But the proof -- the bottom line is, all these
creditors, under 1104(a)(2), need to be considered.

Now Your Honor has asked the appropriate question
which is:  Well, what about equity?  There's two responses
to that.  Number one -- and we've talked about it a little
bit -- Mr. Walsh, in his 60 percent equity position, can't
wag the dog.  He doesn't have an absolute veto over how
Your Honor applies the 1104(a)(2).

More importantly and more recently, we have
Mr. Craven who has weighed in again in favor of 1104
relief.  And, again, for an equity interest holder that far
down the line to say:  Yeah, we would prefer to have the
administrative expense of a fiduciary, that shows a lot
about what everybody has heard here in the last several
hearings.

And it also raises the question as to whether or
not -- and it's a legitimate question as to whether or not
the documents that Mr. Craven signed are really security
documents or whether or not he was basically defrauded in
his security transaction just like Dr. Scheppke.  The
documents are extraordinarily similar and is -- does that
show that he's equity or is it *corpus delicti* and the truth
of the matter is he's a creditor of the case.

I bracket that but we know that there's another

1    big constituency.  The only parties you've heard from that

2    aren't anxious for a fiduciary is Mr. Walsh.  And that's

3    why, you know, we move on under the three cases that I have

4    argued and cited to the Court.

5              La Sherene, under 1104(a)(2) --

6              THE COURT:  Will you spell that, please?

7              MR. ANTHONY:  S-h-e-r-e-n-e.  And, Your Honor,

8    the case law for La Sherene is 3 B.R. 169, and 175 is what

9    ties into where that specific quote is.

10             THE COURT:  Say it again.  What was the volume?

11             MR. ANTHONY:  3 B.R. 169.  And that's where,

12   under the conclusions of law, the Court says:  Nor can the

13   Court ignore the fact that this is the third company that

14   Mr. Kay has managed and which has gone through bankruptcy.

15             And, by the way, that's not a situation where

16   they're saying that the management of the Debtor is

17   corrupt, or fraudulent, or engaging in securities fraud.

18   That's just that he's not -- that he's repeatedly not

19   successful.  So in this case, this is not a La Sherene

20   scenario.  The witness was given every opportunity to tell

21   us all the cases -- all the deals that he had that were

22   going well.  We didn't hear about any of them.

23             We might have heard a portfolio, rather than

24   counsel simply allowing me to go through Fort Bragg and

25   through Fort Benning and these two cases and 26 other

1    entities that were a part of the JohnRuth stay relief

2    where, obviously, the witness thought that stay relief was

3    required.  There are 26 entities that have creditors out

4    there.

5           It's not about whether or not counsel is a --

6    whether or not the Debtor-in-Possession is a good lawyer,

7    he's not a lawyer.  We're not accusing him of not

8    understanding the Code, that's not even relevant.  The fact

9    is he filed, thinking that he was going to get relief for

10   26 businesses, which means that he thinks that at least

11   most of them need a lot of protection.  So 26 is many

12   multiples of the La Sherene problem.

13          And then Sharon Steel is quoted in many other

14   cases about the contrast:  1104(a)(1) is mandatory,

15   1104(a)(2) is flexible.  And the Princeton case is the best

16   indication of that where the Court says:  There's going to

17   be too much gridlock, too much mistrust, too much

18   bickering, so we're going to get somebody in the middle.

19   And to be sure, a fiduciary is not somebody, you know, like

20   a State Court receiver, this is somebody appointed by the

21   U.S. Trustee's Office, based upon experience and expertise

22   with this tribunal and with some of the unique problems

23   presented by this case.  So the idea to avoid bickering and

24   gridlock is out there as well.

25          I don't believe that we need to fall back on

1    11(a)(4) -- I'm sorry -- 1104(a)(2), but I do think that

2    it's important to know that there is a buffet of problems

3    here that would fit into being resolved, including this

4    some sort of a two-page 364 motion on a couple-hours

5    notice.

6         I'm not faulting counsel for doing the best he

7    can with what he has but this is the sort of thing that can

8    be vetted with a fiduciary, rather than on the threshold of

9    a hearing like this.

10        What do we know about the fraud prong as it

11   relates to this case?  Your Honor has heard irrefutable

12   testimony and you've looked at the documents that were

13   signed with respect to the $350,000 Affordable loan in this

14   case.  Six or seven different entities signing papers,

15   including mortgage documents with a potpourri of collateral

16   that Dr. Scheppke, sophisticated businessman, but he made a

17   decision that he was going to sign some documents fairly

18   rapidly based upon this presentation that -- you see the

19   email, what was presented to him, you know, the huge 30,000

20   rents and all of that that were  -- how that was going to

21   happen.

22        You heard how it was represented at 350,000.  It

23   was not going to fix up a delinquent dilapidated wastewater

24   treatment plant, which is what has been alleged, but that

25   350 was going to take utilities all the way to the

municipal system.  And that never happened and we all know

that never happened.

And there's been no accounting until this

apocryphal documentation on the last day of trial about

maybe that some money was spent fixing up the wastewater

treatment plant.  That is just verboten.  It does not match

the loan documents and it doesn't match anything else that

you've heard.

Back and forth the witness has, in different

points, either addressing the Court during hearings or

testifying, testifies as if he's an expert.  He holds

himself out as an expert, but he said that he needs a

$500,000 DIP loan priming my clients at one point.  And

then when Your Honor said the case doesn't have legs, this

thing is about to blow up, then he files a paper -- I think

it's Docket No. 109 -- where he says:  Don't worry about

that, for $10,000 he can keep going.

And that is furtive, that's sharp practice to go

back and forth like that about:  Well, do we need a

wastewater treatment to be hitched up to public utilities,

costing half-a-million dollars, or in the case of the

Affordable investment, 350, which is what the doctor had on

hand?  Yeah, I guess that'll do.

So, what really happened with all of that?  But

the most important troublesome thing about that whole snafu

1    with the funds still not accounted for is that it was not

2    until they visited at On Swann and Mr. Walsh pitched his

3    fourth deal.  Remember, Dr. Scheppke is in for three deals

4    -- Fort Bragg, Fort Benning and this -- for a total of

5    900,000 -- 300, 250 and 350 for this one.  So while he's

6    pitching the fourth deal, Dr. Scheppke shows up with his

7    extra witness and a notary to re-sign all the documents.

8         But by that point, 10 months later, all the

9    collateral has been transferred all over the place -- I'm

10   sorry, has been transferred to Parks Management.  And so

11   the testimony is that there's no collateral other than

12   these two parks at that point.  Parks Management got it.

13   And that is a -- that's a type of a title fraud.  Now the

14   documents were ultimately re-signed.

15        But then when we get back to Federal Rule of

16   Evidence 406 and how these other deals worked and how

17   1104(a)(1) contemplates that other similar situations

18   in bankruptcies matter, both of these companies filed

19   Chapter 11, Bragg and Benning, in Judge Delano's courtroom.

20   My client, Dr. Scheppke put in the money, got no notice of

21   the bankruptcy case, didn't know about it, hired us and we

22   said:  What about this Fort Bragg thing?  That's the first

23   time he heard about it.

24        So how could that be that that Debtor-in-

25   Possession for that company, also a mobile home, didn't

1    notice Mr. Scheppke -- Dr. Scheppke.  And, heaven forbid,

2    the tenants, Your Honor has seen that, the recalcitrance of

3    the Debtor-in-Possession in giving notice.

4         Once again, where did the money go?  We have

5    gone over in exegetical detail the documents for each of

6    these investments.  But in particular, when Your Honor

7    looks at Docket 141, which is applicable to both Bragg

8    and Benning -- and I also believe Mr. Craven's investments

9    -- the reference under 3.1©, requirement of a budget;

10   (d) monthly financials, 3.1(a) board members' meetings with

11   quorum; on 3.3, specified officers, there's been no

12   meetings.  He hasn't been showing -- Dr. Scheppke hasn't

13   been showing up at anything, there's no meetings.  Capital

14   accounts. We know what they are, that's 4.1  He knows what

15   they are and he knows there's been no accounting of any

16   kind.

17        When you go to maintaining books and records,

18   8.1, you've seen the books, they don't exist.  8.2,

19   accountings.  We reckon that a Chapter 11 Trustee will be

20   about get an accounting together if it's somebody with a

21   strong accounting background, forensic accounting

22   background.

23        As far as the filings, there's a requirement of

24   K-1's.  So you've heard Mr. Walsh, just like he articulates

25   his assessment of environmental law and permitting for

1    mobile home units, also talking about that his companies

2    don't need K-1's.  Well, they signed that they do and we

3    don't have them.

4              I think, most importantly, 8.4:  The company

5    shall maintain its funds in one or more separate banks,

6    money  market, brokerage or investment accounts in the name

7    of the company and shall not permit the funds of the

8    company to be commingled in any fashion with the funds of

9    any other person or entity.

10             Furthermore, cash receipts will be collected by

11   the company's management and deposited into one or more

12   company accounts on a regular basis.

13             I don't want to spend my whole 30 minutes on this

14   document but it's extremely well-drafted, it was executed

15   by the parties.  The money was wired and that's the end of

16   it.  *Corpus delicti* is what this is as much as an

17   investment.

18             Where did the money go?  We don't know and I

19   think that goes to the next point, the mush pot.  Your

20   Honor has said it right.  An audit would solve the problem.

21             In the last three months, in addition to being

22   able to maybe file a Plan early, counsel could -- I'm

23   sorry, the Debtor-in-Possession could have spent some of

24   the money from his more successful ventures to hire a

25   forensic accountant, do an audit and explain the mush pot.

1          Instead, we bantered back and forth in what I'm

2     sure the Court found to be snappy rapportage, but created

3     just more heat than light and there's still no way to

4     understand where the money is at Parks Management.  Still,

5     not us.  There's a Debtor-in-Possession account that seems

6     to have very little in collections.

7          The failure to keep tax records, rent rolls,

8     expense reports, proof of insurance pre-petition, no K-1's.

9     All of these problems are problems that could have been

10    resolved pretty easily.  The only evidence we have, as to

11    bookkeeping and financial realities, is public record.  For

12    example, the judgments of the wastewater treatment

13    servicing companies that were paid off by Mr. Baluja or in

14    the case of Chipley, which doesn't have a wastewater

15    treatment canard, we have a $25,000 maintenance fine from

16    the municipality.  So we really don't have much there that

17    we can go by.

18         If we had something, maybe it would be serious

19    enough to call it a <u>Colby</u> books in disarray but what we

20    have right here is really no books at all.  And their

21    explanation:  Well, we're just getting them, is proof that

22    if there isn't fraud then it's just totally mismanaged

23    because even a candy store at a high school has an

24    inventory and keeps records of the money coming in.

25         Let's move to the title fraud.  Your Honor heard

1    Mr. Walsh -- by the way, you didn't hear Mr. Hancock making

2    the legal argument.

3              THE COURT:  Two minutes left in your 30.

4              MR. ANTHONY:  I'm sorry, how many?

5              THE COURT:  Two minutes left.

6              MR. ANTHONY:  Oh, my goodness.

7              THE COURT:  Do you want to revise your estimate?

8              MR. ANTHONY:  Let me revise my estimate and try

9    to go maybe another 10 or 15.

10             THE COURT:  That means that you (rererring to

11   Mr. Hancock) likewise will have that amount of time.  Go

12   ahead.

13             MR. ANTHONY:  The title fraud issue.  Mr. Walsh

14   testified that somehow it's okay to transfer title because

15   it's real property, or something of that nature.  Nobody

16   understands his analysis, no case has been articulated, and

17   counsel will not make that argument.

18             But what we do know is that after it was resold

19   -- it was sold to Mr. Austin, 16 units, one of them,

20   because they haven't produced the other documents, just

21   flat haven't produced them -- and that's worthy of a

22   negative inference, an adverse inference -- we know that

23   Unit 54 was then transferred to Ms. Catazaris and then to

24   Ms. Walls who we dropped off just to truncate the trial.

25   We know that those transfers occurred.

1          Mr. Walsh's explanation is:  Well, they were

2     under contracts for deed so that I can do that.  It's a

3     non-sequitur but let's go ahead and say that maybe it has

4     -- it makes some sense.

5          Mr. Walsh's title is contract for deed.  He's in

6     a contract for deed with Mr. Baluja's company.  So does

7     that mean that Mr. Baluja could do that to him?  You see,

8     business can't operate like this.

9          Mr. Baluja would not go ahead and sell the titles

10    out from under Mr. Walsh while an agreement for deed is

11    under -- is being performed; and, yet, Mr. Walsh did

12    exactly that to Mr. Austin.

13         And the most interesting of all is that -- and we

14    didn't know it until the hearing -- was that when we looked

15    at the current rent roll, which was one of our items

16    published, it -- you see that Mr. Austin, Mr. Walsh said

17    that he evicted him, but he's on the current rent roll for

18    all these units.  So how could he justify selling and

19    reselling to Ms. Catazaris and Ms. Walls when he is showing

20    in the records he files with this Court, sent to us under

21    an adequate protection order, and it shows Mr. Austin still

22    in possession?

23         And what we have here -- if all he's going to say

24    is, "I screwed up," okay, that's gross negligence, but we

25    don't think that he just screwed up.  Mr. Austin has never

1    been evicted.  You heard that and we see nothing in the

2    record about that.  An eviction action was commenced and it

3    produced a judgment in favor of Mr. Austin.

4            Now this isn't the only act of Mr. Walsh just

5    saying things that aren't true.  Perhaps the most

6    interesting one was about the cash rents.  And after two

7    years of nonpayment, all of a sudden COVID is the

8    justification for all sorts of problems.

9            You have Mr. Walsh, during his deposition,

10   saying, "We don't accept cash rents," categorically.  And

11   then we show him the email that says that he did and he

12   says, "That wasn't authorized."  In the box, he says, "We

13   did that because of the COVID."  But the email in question

14   dates to February 25th, before the COVID, so he knows that

15   that isn't the case.

16           Not only that, but the COVID would not suggest

17   that you cut off the ability of tenants to pay online, or

18   at the bank, or on the phone because that's easier.  They

19   can talk into their own COVID phone receiver and make the

20   money move that way or online.  So it was totally

21   non-plausible.

22           What does Mr. Walsh do then?  He decides to start

23   talking and meandering into the topic of the wastewater

24   treatment plant as if that's the problem.  And, yet, Plum

25   doesn't have a wastewater treatment plant problem.  So,

once again, his second explanation for why he did that does
not make sense.

So we have, first, he denies it; then he comes up
with the excuse about the COVID; then he comes up with the
excuse about the wastewater treatment plant; and, in the
meantime, nobody has any money.  So we have vivid gross
mismanagement at the very least, but I think we all know
what it is.

Now, post-petition finance canard.  I dealt with
that a little while ago but it really is assigned to
mismanagement when you go out and try to place a senior
lien during a bankruptcy case for a purpose that will not
be enhanced.  And then when you hear the Court talk about,
"Well, this doesn't have legs," you go back and say, "Well,
I do actually have some wastewater treatment specialist who
says it's a $10,000 problem."

What we've seen here, and Your Honor has seen it,
you've heard it, every time the Debtor-in-Possession has a
problem, you go say that, "Raj Baluja sold me a bad park."
And Raj Baluja supports an 11 Trustee who is going to say,
"By the way, Mr. Baluja, what was the condition of the park
when things started?"   He's okay with that because what we
already know, and you heard it from Dr. Scheppke, that in
his last conversation with Mr. Walsh about these disputes,
he said, "Don't worry about it, I always renegotiate.

1       After I get purchase seller financing, I always

2   renegotiate."

3               And the witness even admitted that there are two

4   other instances besides this one in Georgia where he just

5   goes ahead and closes and then immediately starts blaming

6   the seller about selling, "Well, we didn't know about this

7   problem or that problem."

8               In fact, it's interesting to go back to Fort

9   Bragg and Fort Benning, the whole park was razed in the

10  case of Fort Benning.  The mobile home units were all

11  condemned in Fort Bragg, and what did that turn into?

12  Blaming the seller.  Always, it's the seller's fault that

13  all these problems occurred.

14              Take a look at the pictures of the park, these

15  parks, that were taken by the appraisers and it will give

16  you pause as to whether or not the trash, the damages, all

17  these things have anything to do with Mr. Baluja or whether

18  or not the tenants have a problem, in fact, with the way

19  the parks are maintained.

20              Dr. Scheppke said that, in addition to the parks

21  down here and the condition that they're in, he went to go

22  see his parks.  Remember, segregated funds to fix up those

23  units and there were no units at all.  He's got $600,000

24  that, according to the documents that he signed, are

25  supposed to be sitting in a segregated account because no

money should've been disbursed if all the buildings were --
if all the mobile homes were flattened.

Now you heard for the first time in the witness
box that Mr. Walsh says, "Well, some of the money was spent
to fix them and then they were flattened."  Again, gross
negligence and the best possible thing you can say is:  If
I believe you, it's gross negligence.

So we move next to Mr. Craven, another issue,
bracket the 341 problems, bracket the tenants, bracket
Dr. Scheppke.  We have the statements made right in the box
from Mr. Walsh saying, "Hey, the purchase price, it was
always 700,000."

Okay, let's say that it was and there's no
explanation to the email, no explanation whatsoever to the
email that he told Mr. Craven that it was 800,000, and
98,000 was not -- you saw the closing statement -- 98,000
just went into the ether, hasn't been accounted to for the
principal.  One of the principals, Mr. Craven, just has no
idea where that went.  And that's super important, as it
relates to this fraud element.

Our conclusion about (a)(1) and all of that goes
equally as it would to (a)(2) if you just say we're
bickering.  We're bickering because we strongly believe
there's fraud.

What could Mr. Hancock do?  He knows what he has

1    to do and he didn't do it.  Not because he didn't know.  He

2    could have been here presenting a real expert witness on

3    forensic accounting who had looked at the books and

4    validated it.  He could've inoculated this case, maybe we

5    would be talking about an Examiner now.

6              He could have had an appraiser here who said,

7    "Yeah, I looked at the parks, they're sweet, they're very

8    well-maintained."  We don't have anybody here.  It's not

9    for lack of trying.

10             We're 81 days in, in the Gainesville case.  Under

11   362(d)(3), he would've had to file a Plan anyway.  It

12   would've been a great idea proactively to file something

13   early to say, "Hey, this has legs," rather than come in at

14   the last minute with whatever your client is giving you at

15   1:00 in the morning the day of the hearing.

16             And again, none of this is to impugn.  We all

17   take our clients as we see them.  This matter has been as

18   well-presented by Debtors' counsel as it could possibly be

19   but you have not seen a single witness, even Mr. Mance.

20   Where is Mr. Mance?  He's the guy who Your Honor heard was

21   going to explain how the mush pot worked.  Instead, he

22   isn't here.  Why?

23             So, what you have is one man testifying and

24   saying, "All these things are bad, it's not my fault."

25             And there's a UCLA coach who used to say, "You're

1   never in serious trouble until you blame everybody for

2   everything bad that happens to you."  And at a certain

3   point, we have to say, "These are your parks, they've been

4   mismanaged and it's time for somebody else to do it."

5           I want to talk about the rift.  The man says he's

6   an expert and the rift between that expertise and what he

7   bought these parks for and then what they are now.  We've

8   not been saying that all mobile home parks are great.

9   Mobile home parks are not for the wealthy, we understand

10  that.  Matthew 22 or 26:11:  The poor will always be with

11  us.

12          This is not something where we say we're going to

13  blame the owners of parks for bad things that happen there.

14  But the level of mismanagement and what has gone on here is

15  unprecedented.

16          And while we have on this edge of the next

17  recession, of the next Great Recession, all the

18  restaurants, all the gymnasiums, all the hotels that are

19  rolling in as they go from the credit line, the line of

20  business, to the law firms, to this court, and all of

21  those, that makes sense.

22          But to say that, well, COVID is the reason, the

23  tenants who were on fixed incomes, whether it was Social

24  Security, or Medicaid, or whatever the program is, to say

25  that that somehow means that all the mobile home parks are

1   going to fail, there's been no evidence of that.

2          What there's been evidence of is title fraud and

3   bad mismanagement.  And I think that it's pretty clear that

4   what we have here is a scenario where the parks can be

5   stabilized, they can move forward.  They're going to have

6   the support of the creditors.  And somebody intelligent can

7   take care of these assets in a responsible way.

8          In the meantime, if there are any Hail Mary

9   passes that make this moot, everybody would be delighted.

10  Our clients need clean money and Your Honor can be the

11  gatekeeper of that.  And the Office of the U.S. Trustee

12  will certainly be vigilant.  But what we see is that this

13  is the perfect case for the administration under 1104.

14          Thank you, Your Honor.

15          THE COURT:  All right.  That's 40 minutes.  Thank

16  you.  Wait, before you sit down, I have a couple of

17  observations or questions because I just don't remember

18  this and I'm not looking at my notes right now.

19          You indicated that Dr. Scheppke had no notice of

20  the Fort Benning and Fort Bragg bankruptcies, I guess,

21  until after a time when he probably otherwise should've.

22  Where is that in the record?

23          MR. ANTHONY:  He testified to that and there's

24  also the bankruptcy schedules and Statement of Affairs that

25  are --

1          THE COURT:  Are those in the record?

2          MR. ANTHONY:  Yeah, they are attachments to the

3    civil theft letter.  And the civil theft letter references

4    the fact that there is -- under the schedule that relates

5    to equity, Mr. Walsh put "none."

6          THE COURT:  I remember those.

7          MR. ANTHONY:  Yeah.  So we got no notice of that,

8    there was no notice anywhere in the bankruptcy case where

9    Dr. Scheppke gets notice in either one of them.

10          THE COURT:  Okay.  Are you aware, as a matter of

11    law, whether a consolidated group tax return that includes

12    real estate trusts is required to include copies of K-1's

13    which would then presume that K-1's would be delivered to

14    those who were entitled to have them?

15          MR. ANTHONY:  Your Honor, I wish that I did.  We

16    have been in a little bit of a scramble to respond to every

17    legal point that we've heard testified about.  And if we

18    did, it would be great but what I --

19          THE COURT:  The answer is, "No, we haven't looked

20    that up"?  Okay.

21          MR. ANTHONY:  The answer is, no, that -- exactly.

22          THE COURT:  Okay.

23          MR. ANTHONY:  And, further is, it should've been

24    looked up by the Debtor-in-Possession beforehand.  Kind of

25    like this permit thing, the witness said that he didn't --

1    that no permits were required for mobile homes.

2              THE COURT:  That is not exactly what he said;

3    okay?  What he said was:  He's not responsible because the

4    seller is going to get them.  And, in fact, the seller

5    includes a charge for that.  So --

6              MR. ANTHONY:  Then my recollection was wrong.

7              THE COURT:  Okay.

8              MR. ANTHONY:  Thank you, Your Honor.

9              THE COURT:  Okay.  And then on the bank account

10   regarding Fort Benning and Fort Bragg, I thought that

11   Mr. Walsh testified that he did have separate bank accounts

12   for those two, that they weren't part of the mush pot

13   program.

14             MR. ANTHONY:  So, Your Honor, I think that's

15   where veracity comes in.  Dr. Scheppke said he's never seen

16   such an account and he has asked.  And Mr. Walsh said --

17             THE COURT:  Okay.  That's enough.  Thank you.

18             MR. ANTHONY:  Thank you.

19             THE COURT:  The tax records of the two Debtors

20   before me, you would concede, that those have been

21   produced, the tax returns -- the schedules that were

22   attached to the consolidated group.

23             MR. ANTHONY:  If I could wait one moment, Your

24   Honor?

25             (Pause in the proceedings.)

1    MR. ANTHONY:  So as part of the consolidated

2    JohnRuth return, we got everything redacted except for the

3    schedules relating to those Debtors.

4    THE COURT:  Okay.

5    MR. ANTHONY:  And we've got copies of them.  And

6    the problem with having copies is that they're copies.

7    THE COURT:  Well, I couldn't make a finding that

8    they did not produce the tax records for these two Debtors.

9    MR. ANTHONY:  Right.

10   THE COURT:  Okay.  Is there something in the

11   record that shows that Mr. Baluja paid off judgments of

12   vendors who worked on the wastewater treatment plant?

13   MR. ANTHONY:  Your Honor, I believe that it's in

14   the One Family proof of claim that has not been objected to

15   and that was in the evidence.  And Mr. --

16   THE COURT:  The proof of claim is in evidence?'

17   MR. ANTHONY:  My recollection was that it was in

18   evidence but if you wait one moment, if I'm wrong, then

19   Mr. -- either Mr. Hancock or Mr. Lafalce are going to

20   correct me rapidly.

21   (Pause in the proceedings.)

22   MR. ANTHONY:  So I'm hearing but I don't know it

23   myself.  When we requested judicial --

24   THE COURT:  Wait a minute.  133 is proof of claim

25   for Affordable Housing; 134 is a proof of claim of SN

1    Capital; 136 is a proof of claim for One Family.

2              MR. ANTHONY:  So we're looking for One Family and

3    also, if I let the Court and also counsel know, is also I

4    am being told by our client is public record in the

5    foreclosure action that we requested judicial notice of and

6    I don't want that to be an unfair net to just throw over a

7    thousand more papers.  But I do seem to recall that there

8    was a $35,000 judgment that was acquired that shows up on

9    the record of that foreclosure.

10             THE COURT:  Let me -- you know, I'm not looking

11   at the entire foreclosure record.  I'm taking judicial

12   notice of the fact of filings and anything in there that I

13   may permissibly take notice of; certainly, a public record

14   would be that.

15             I'm looking at the proof of claim at Exhibit 136

16   by One Family.  The total is 2,106,796?

17             MR. ANTHONY:  So, Your Honor, the notes to the

18   proof of claim reflect the principal balance of 1,891,556.

19             The court:  I see it.  Cain Enterprises'

20   judgment?

21             MR. ANTHONY:  Yep, that's them --

22             THE COURT:  I see it.

23             MR. ANTHONY:  -- that's one of them.

24             THE COURT:  Okay.  And, then, let's see what

25   else.

1          My sense of the record regarding reselling Unit

2    54 is that it was sold -- it wasn't sold, rather there was

3    an option to purchase.  And you've characterized it as an

4    outright sale.  And so where in the record is it an

5    outright sale?

6          MR. ANTHONY:  So, Your Honor, it's an option --

7    it's a 10-year option where they make their payments and

8    basically contract for deed for it.  So if it's a contract

9    for deed, it's the same sort of a contract that Mr. Baluja

10   has and, yet, Mr. Baluja was not out selling the title out

11   from under Mr. Walsh because everybody knows it's fraud.

12          THE COURT:  Okay.  That's it.

13          MR. ANTHONY:  So it's 52 through 58, exclusive of

14   57.

15          THE COURT:  Right.  I have that.  Okay.  All

16   right.  That was, as I said, 40 minutes and so now I'm

17   going to ask Mr. Hancock.

18          Does anyone want to take a break?  You ready to

19   go?

20          MR. HANCOCK:  I think we are.

21          THE COURT:  40 minutes.  Go.

22          MR. HANCOCK:  Your Honor, if I could just add,

23   just for a point of reference -- I'm not asking you to read

24   it -- but our Exhibits 11 through 14.  11 through 13 are

25   the 600 pages broken down; 14 is --

1          THE COURT:  Hold on, 11 through --

2          MR. HANCOCK:  14.  The first three of which are

3    the 600 pages of bank reconciliation tied to the internal

4    software.  The last one, 14, is by quarter, so it would be

5    quarterly broken down because it's so voluminous.

6          THE COURT:  And that was one Debtor but not

7    both --

8          MR. HANCOCK:  Uh --

9          THE COURT:  -- the quarterly, as I remember.

10          MR. HANCOCK:  Yes, that is correct, Your Honor.

11          THE COURT:  Okay.

12          MR. HANCOCK:  Your Honor, I will start with

13    reference to the case In re Sundale, LTD and Kendall Hotel

14    and Suites, LLC.

15          THE COURT:  Okay.  Spell what you just -- the

16    name of the case.  Sundale?

17          MR. HANCOCK:  Sundale, S-u-n-d-a-l-e. Limited,

18    LTD.

19          THE COURT:  Okay.  Cite?

20          MR. HANCOCK:  It is 400 B.R. 890 --

21          THE COURT:  All right.  And the other one?

22          MR. HANCOCK:  -- Southern District of Florida

23    2009.  That's the main one, Your Honor.  I'll jump to the

24    other one.  It was just a long name of the case.

25          THE COURT:  I see.  Okay.  Mr. Akbari, would you

1    go and bring me a copy of that?  Thank you.

2              MR. HANCOCK:  Your Honor, within that case --

3    that is a Southern Florida case -- it is a gentleman who

4    owned a hotel.  Immediately next door, he owned a piece of

5    real estate and there was some sort of business that was

6    conducted on that second piece of real estate.

7              The allegations, which the owner, I don't

8    believe --

9              THE COURT:  Hold on.

10             (Discussion off the record with the Court's

11   law clerk.)

12             THE COURT:  Sorry.  Go ahead.

13             MR. HANCOCK:  The man owned a hotel and next to

14   it was another piece of property he also owned.

15             MR. HANCOCK:  Yes.  So among the allegations,

16   which I don't believe the owner ever disputed, were that

17   they failed to pay real estate taxes, they failed to pay

18   personal taxes, they failed to adequately transfer a liquor

19   license to the hotel; yet, sold, through the hotel, liquor,

20   which was apparently illegal, but the Court said as long as

21   then afterwards they gave it away, that was fine.

22             They commingled funds between various entities of

23   this owner.  The owner paid for debts post-petition without

24   getting approval or notice to the Court.  There were

25   multiple issues with the schedules or the schedules were

1    incomplete or the schedules failed to list distributions to

2    the owner as well as to other people.  Money was taken out

3    post-petition.

4           So those are the main points that again the

5    owner, as far as I can tell, didn't dispute.  This was over

6    a portion of eight days from May through December in 2008

7    that this court held their eight-day trial.

8           THE COURT:  Who is the judge?

9           MR. ANTHONY:  Isicoff.

10          MR. HANCOCK:  I'm sorry?

11          MR. ANTHONY:  Judge Isicoff.

12          MR. HANCOCK:  Oh, okay.  All right.

13          THE COURT:  All right.  Thank you.

14          MR. HANCOCK:  Your Honor, what the court

15   ultimately held was that the collective creditors did not

16   prove, did not meet their burden of clear and convincing

17   evidence.  What this court found and tied into other cases,

18   including SunCruz Casinos, 298 B.R. 821, which is that is a

19   very high burden to overcome the understanding and the

20   general practice that the debtor-in-possession should

21   remain the debtor-in-possession.  But that person is the

22   most knowledgeable about and best able to run the Debtor's

23   business.  And because the appointment of a Trustee is such

24   an extraordinary remedy, the moving party must show that

25   cause for appointment exists by that clear and convincing

1    evidence.

2            Also cited there is the same, that Sharon Steel

3    Corp case cited by counsel, 871 F.2d 1217.

4            The court ultimately found, Judge, that these

5    were mere allegations and while the debtor-in-possession

6    admitted to most, if not all of them, it just wasn't

7    sufficient.  He testified, unrefuted, that he did take

8    money out of the Debtor but that he put a lot more back in.

9    His accounting was so poor he couldn't even say how much he

10   put in, although he thought it was about 19 million.  What

11   accountants later found out it was maybe somewhere closer

12   to about half that.

13           The court here again, after hearing all of that,

14   found that the court must use a cost-benefit analysis, must

15   determine if that actually benefits -- in this case the

16   tenants -- in that case the occupants.  Here, all the

17   secured creditors, the unsecured creditors, the equity

18   security holder Mr. Craven.  And that based on that, this

19   Court found they not only didn't meet the clear and

20   convincing, didn't meet preponderance of the evidence.

21   This was just, unhh, he made several poor decisions, did

22   several things that were either odd, including failed to

23   follow corporate formalities, failed to keep accurate

24   records, failed to pay the taxes.  Although, the taxes, he

25   testified to, was a business decision.  We can't pay

1    everybody, so we've got to not pay at least somebody, we

2    won't pay taxes.

3         The liquor license issue.  I believe even after

4    he was told not to do it, they continued to sell but then

5    later say that it was a soda or they were just giving away

6    liquor, even though that's illegal to do, and the court

7    found that wasn't enough.

8         There was a fire sprinkler issue, a safety issue,

9    a wastewater facility issue.  Tried his best, couldn't get

10   it done, and until the court put somebody on the stand from

11   the fire investigation unit, they found it isn't necessary.

12   It is a safety issue, but you don't have to have it.

13        Taking money out of the hotel.  The creditors

14   failed to demonstrate the flow of money in and out of the

15   debtors was designed to or, in fact, cheat or defraud the

16   creditors.

17        Here, it's unrefuted.  It's unrefuted again as to

18   the documents that were put in by counsel, the 140, or the

19   19 or so that were allowed in from the Debtor.  There's

20   nothing showing that anything was taken.  There's never

21   been a distribution.  For the first year or so, Parks

22   Management took a 10 percent of what was gross receipts in

23   as a management fee.  Then, that was stopped because there

24   just wasn't enough.

25        Court found that poor management alone does not

1    warrant appointment of a Trustee; that poor management does

2    not constitute gross mismanagement.  It is error, it is

3    mistake.  And that the creditors couldn't fail in this

4    case, similar to here, to prove that if anybody else was in

5    possession of the parks -- if Mr. Baluja and, again, if

6    he's saying now, "I don't want to be in charge," fine, pick

7    anybody else.  If anybody else was in charge of Plum Circle

8    or the two Debtor properties at Gainesville, there wouldn't

9    have been any difference.

10           Clearly, not after February, Your Honor, when we

11   were accounting now for COVID, yet the park is still open.

12   The wastewater is within $10,000 of remaining open

13   indefinitely.

14           Again, in this case, they were talking about the

15   abysmal economy and nobody could say that that wasn't

16   enough of a factor to offset any mistakes of the owner, any

17   mistakes of the operator of just not having enough funds.

18   He had to put money in.

19           The same thing here.  So whether you want to go

20   with a COVID mistiming, we're all under the same order with

21   the Governor DeSantis as far as the moratorium on rents,

22   Your Honor.  That doesn't change.

23           So even if everything was just perfect through

24   February, it wouldn't be now.  That's five months, just

25   like the restaurants and the other hotels that will be

1   knocking on this Court's door.

2         The court ultimately found that at this juncture

3   it would not be in the best interest of creditors, equity

4   security holders or other parties in interest to appoint a

5   Trustee; that prior to having the Court make a

6   determination on the feasibility of a Plan, we're close

7   enough now, that is what should happen.

8         The creditors really just want to get paid

9   quicker and that's why they made the big deal, that's while

10  they filed so many voluminous pleadings and it just doesn't

11  make economic sense.

12        The last thing, Your Honor, as to that Sundale

13  case, I will read a few sentences from the conclusion.

14        "The extent of the litigation in this case has

15  been significant.  I can only imagine the costs are

16  staggering.  While the debtors have brought a great deal of

17  this on themselves due to the careless and sometimes

18  flippant manner in which they have handled certain aspects

19  of these bankruptcy cases, the movants have almost drowned

20  out the legitimate concerns in a flood of excessive and

21  sometimes irrelevant or superfluous information."

22        Your Honor, that's where we're at here.  We've

23  heard allegations from -- is it day one of Plum, for sure -

24  - and by day three of Gainesville.  We're not talking at

25  this trial, which I'm thankful for, about arson, about dog

1    maulings, about being a murderer.  We've heard them and not

2    once, Your Honor, and not twice.  They've been in

3    pleadings, they've bee repeated in hearing.

4            THE COURT:  I gave them a pretty big brush-back

5    pitch and when they didn't retreat, I gave it to them

6    again.  I think they heeded the Court's warning.

7            MR. HANCOCK:  Well, apparently they did, Your

8    Honor, at least for the trial purposes.

9            Your Honor, we heard from just a few witnesses.

10   We heard from Dr. Ken "Sha-packie" who introduced himself

11   as Dr. Ken "Sha-packie."

12           THE COURT:  It's "Shep-key."

13           MR. HANCOCK:  "Shep-key."  I'm sorry.  Dr. Ken

14   Scheppke.  And then he rattled off his list of either

15   accomplishments or managerial positions he's held as some

16   sort apparently of expert positioning and understanding of

17   how real estate parks work.

18           He did, ultimately, Your Honor, admit to getting

19   a text from Mr. Walsh about his safety and well-being, but

20   he brushed it off as either he, Dr. Scheppke, answering to

21   his wife, which Mr. Walsh wouldn't have known about, or

22   that it was somehow related to the weather back on July 2nd

23   of '19.

24           We didn't hear from Raj Baluja, we didn't hear

25   from Shawn Austin, not that there's much to say with Shawn

Austin either way.  We actually didn't hear from a single

tenant or any other witness outside of Mr. Hockenberry who

misidentified Sean Brijmohan as being about 5'6" and saying

that Sean handed the money directly to his buddy who then

put it into his wallet.

To date, Your Honor, all schedules are complete.

The initial Debtor interview was done, insurance is in

place.  The parks are open and ready for business.  They've

been open and continued in business, I believe Mr. Anthony

said, for 81 days now post-filing.

The DEP has made it clear there are two things

left, they are paying two separate fines.  Otherwise, they

are set to go and, again, continue to operate.  Who else

would've done this?  Who else, at least over the last five

months, would've done this?  Who could put the park in a

position to be $10,000 away from being acceptable to the

City of Ocala to connect to the wastewater?

There are seven new units to be put in place,

$10,500 in net rent.  That's uncontroverted.

We go to the next witness, Your Honor,

Mr. Scroggie, the appraiser.  He said after all this and

the terrible state of affairs that have alleged from day

one, there is one, a grand total of one unit, that cannot

be rented out today.  He said -- and then I asked him to

follow up and he clarified again, this is delayed

1    maintenance.

2            Fine.  Again, that's another mistake, that's a

3    cash issue.  That isn't gross mismanagement, his words, the

4    unrefuted expert who handles mobile home parks, who sells

5    them, who buys them.

6            The odd thing with his testimony, Your Honor, was

7    when it came up with $700 per unit, I don't believe he

8    clarified that.  He did specifically say he had no

9    financial information.

10           So then the question was posed to him,

11   hypothetically:  If seven new units were put in, they are

12   two and three bedrooms, and it's proposed that maybe that

13   would be a net $10,500 income to Gainesville, would you say

14   that was dollar-for-dollars?

15           He said:  First off, that's not going to be what

16   the rent is.  He said that would be the same income, $700.

17           So I asked him for clarification on that.  "How

18   could you say when you previously testified some of these

19   units can't even be insured, how are they going to have the

20   same rent?"  He didn't have an answer for that.

21           He said:  Well, maybe some of these could get 750

22   and then maybe the three bedrooms could get upwards to

23   1250.  Just an odd thing to equate brand new 2020 units --

24   first off, why would he have to look at them?  They're

25   brand new -- they are what they are, they're mobile home

1   units -- versus 40-year old units that can't even be

2   insured.  He said he didn't have enough information.

3          Then, for Dr. Scheppke, who after all of his

4   credentials and reading off how many great things he's

5   done, somehow was ineffective and personally unable to

6   communicate with the staff of Parks Management, with the

7   CPA firm that represented or filled out the paperwork for

8   Parks Management, for JohnRuth and for the two Debtors.

9   And then the third failure was Dr. Scheppke was somehow

10  unable to log in to a portal provided solely for him.  If

11  it is just he and his partner is Mr. Walsh, he couldn't

12  figure it out, so we gave up after a month or so.

13         There was no documents put into evidence and

14  nothing testified to specifically from Dr. Scheppke, other

15  than just his word:  Yeah, I requested this information, I

16  didn't get it.

17         He did mention a few times that he was a victim

18  here.  Again, with his expertise, his long list of

19  credentials, I just mentioned his three failures here.  So

20  if again we're not going to consider that he's a physician,

21  fantastic.  He's the head of the COVID for the State of

22  Florida.  Again, fantastic.

23         But as to here, what about these three issues?

24  You couldn't communicate with the office that you just

25  invested with.  Did you send a demand letter?  Sure didn't.

1            You couldn't communicate with the CPA who has

2       their own office, who has a license, who is required under

3       the IRS to complete certain forms and to provide those

4       forms, somehow couldn't communicate.  And then, again, the

5       portal that Mr. Walsh set up solely for Dr. Scheppke, again

6       was somehow beyond what he was capable of doing.

7            Your Honor, the creditors failed to ever call Raj

8       Baluja.  The Debtor didn't have the burden here.  We

9       certainly could've called him but we didn't.  And, Your

10      Honor, even though he wasn't on the stand, he is front and

11      center here on the TV screen and it is important to note

12      his demeanor.

13           Your Honor mentioned at our July 22nd hearing

14      that while it was up to each witness and each party, if you

15      wanted to be live and in person or if you wanted to be on

16      TV, the best way for the Court to determine somebody's

17      credibility is their demeanor.  Again, I don't know what

18      Your Honor's view is, but you have a nice size screen there

19      and I believe you can see everybody, or you would've let us

20      know.

21           I was not able to point out during testimony of

22      other witnesses, mainly Mr. Walsh, that when it came to

23      talking about Mr. Baluja, Mr. Baluja was completely unable

24      to keep his composure.  He was sweating a great deal, he

25      adjusted his tie multiple times, scratched the back of his

```
 1    head and otherwise had to fidget around in his seat.
 2              THE COURT:  Mr. Hancock, he didn't testify.
 3              MR. HANCOCK:  Yes, Your Honor.  He was live in
 4    person by video--
 5              THE COURT:  It doesn't matter --
 6              MR. HANCOCK:  -- the same as if he were here.
 7              THE COURT:  -- he didn't testify.  He wasn't
 8    under oath.
 9              MR. HANCOCK:  Yes, Your Honor.
10              THE COURT:  So, what does sweating and fidgeting
11    have to do with anything?
12              MR. HANCOCK:  If he wasn't put under the scrutiny
13    as Mr. Walsh, again, we could've called him, we didn't.
14    The difference is, Your Honor, when Your Honor was
15    questioning Mr. Walsh and it seemed like it was going
16    possibly in the other direction about receipts, about
17    invoices, Mr. Baluja at the same time couldn't contain his
18    smiles.  It has to amount to something.
19              Just like if Mr. Walsh would've said --
20              THE COURT:  I wasn't paying attention to somebody
21    smiling in the grandstands because I'm like the referee,
22    the umpire.  I have to zone in on that 99-mile-an-hour
23    pitch.  So you're wasting time on your closing argument
24    with this line or this direction.
25              MR. HANCOCK:  Your Honor, we didn't hear from a
```

1    single park resident.  Again, it's not been confirmed and

2    it's clearly not on the rent roll that Mr. Hockenberry was

3    or is a resident of the park.  There was no living person,

4    no witness to tell any of the great tales of how awful

5    Mr. Walsh is.

6          Mr. Hockenberry, who apparently bought for his

7    wife a riding mower from some random person who is, as of

8    yet, an unidentified visitor to the park.

9          The creditors' exhibits demonstrated that the

10   Debtors paid on time and paid in full the first eight

11   months for the park, the 14,000, the 14,000, the 8 and the

12   7,000, all the way through.

13         Mr. Walsh testified to the $200,000 principal

14   reduction offered by Mr. Baluja who -- it has been said at

15   hearings and in pleadings -- that this was for no legal

16   reason to do so but just did it.  We've just heard again

17   that Mr. Baluja is a businessman, he lives in Canada.  He's

18   not Caleb's buddy, they were partners before this.  But for

19   no good reason, took $200,000 off.  For no reason, entered

20   into a contract addendum that called for a closing on

21   December 1st of '18, which would result in a 30-year note

22   which never happened, only as a result of Mr. Baluja.

23   That's uncontradicted testimony of Mr. Walsh.

24         Mr. Baluja was fully informed throughout of all

25   the efforts of Mr. Walsh from beginning to end, including

1    the DEP issues beginning June of 2018.  The permit that

2    Mr. -- that we've asked the Court to pay special attention

3    to, document -- Item No. 3 for our exhibits, Your Honor --

4    is the permit that Mr. Baluja asked the State of Florida to

5    backdate 11 months to try somehow, even though it's on

6    paper that he signed, to take away some of his liability.

7           We know that Mr. Baluja, upon finding out that

8    Silver Hill was backing out for environmental reasons said:

9    We are intelligent people, I'll come down and we will

10   figure this out.  So, what happened?  May 15th and 16th of

11   '19, Mr. Baluja was then with Mr. Walsh two straight days.

12   What happened?  Mr. Baluja penned an agreement.  Mr. Baluja

13   posed for a shot with the agreement.  That is again one of

14   the things we're asking the Court to pay special attention

15   to.

16          After that they went back to Mr. Walsh's office

17   where Mr. Baluja himself filled out three checks on behalf

18   of Parks Management, had Mr. Walsh sign the three checks

19   and then left, which has now been a pattern established by

20   Mr. Baluja.  He then notified Mr. Walsh --

21          THE COURT:  Okay.  Tell me how this goes to

22   Mr. Walsh's ability or being impeded in an ability to

23   manage the parks?

24          MR. HANCOCK:  It absolutely does, Your Honor.

25   Has to fund the wastewater facility, has to keep it

1  operational.  That's what he was focusing on, trying to

2  make the park liquid, trying to get something in place.

3  Mr. Walsh testified just to that, Your Honor.

4       THE COURT:  And it didn't work.  He didn't get to

5  re-amortize the note.

6       MR. HANCOCK:  Right.  But what Your Honor just

7  asked was how that was going to affect this.  Mr. Walsh

8  testified:  That was going to buy me time, it was going to

9  give me a lesser number I didn't have to battle.

10       THE COURT:  And it didn't come in.

11       MR. HANCOCK:  I'm sorry, Your Honor?

12       THE COURT:  That did not come in.

13       MR. HANCOCK:  Which --

14       THE COURT:  The re-amortization, to free up the

15  cash flow, it didn't happen.

16       MR. HANCOCK:  Right.  That's what his efforts

17  were focused on, was trying to get that so he could then

18  fund the connection.  The connection wasn't just brought up

19  after the case was filed here, it was known back then.  It

20  was in emails, Mr. Baluja was aware of it.  It was efforts

21  then which didn't happen.

22       THE COURT:  It's been chronic.

23       MR. HANCOCK:  What was the last thing Your Honor

24  said?

25       THE COURT:  I said it's been a chronic problem.

1          MR. HANCOCK:  Yes, Your Honor.  Your Honor, well,

2    after all the statements, after all the allegations, we're

3    here.  We heard again from only Dr. Scheppke.  He said he

4    was a victim.  He said he didn't acknowledge that he was

5    under pressure from anyone, other than possibly his wife,

6    to make good and to collect money.  He disagrees with

7    Mr. Walsh as to the basis for the 10 months.

8          Mr. Walsh's position is that was based on

9    attorney error, getting the addresses wrong.  But Mr. Walsh

10   is more than happy and, in fact, did get back with the

11   attorney, correct that and it did get signed.

12         Your Honor, Mr. Walsh is ultimately responsible

13   to this Court, to the tenants, to the creditors.  He is

14   the Trustee of the park.  Who would've done better than

15   Mr. Walsh, over the course of the last two-and-a-half

16   years?  Who would've stuck with that?

17         Your Honor, after now we're at our third day of

18   trial, the burden has not been met.  It is a high burden,

19   it is clear and convincing evidence.  We just haven't heard

20   that.  We're all left again at this point with only

21   Dr. Scheppke and he alone didn't meet the burden.

22         The documents that were presented, if they were

23   questioned to Mr. Walsh, he explained them all.  These

24   were, at most, mistakes.  Most of them weren't that, Your

25   Honor, though.  They were just piling and piling on.  They

1    weren't mistakes, they were efforts.  They're documented

2    efforts to refinance the park, documented efforts to keep

3    the wastewater facility plant operational.

4              A key point to that, Your Honor, is U.S. Water.

5    They had them working it, they had been the assigned

6    engineer.  They jacked up the price, they tried to pull one

7    over on Mr. Walsh after the DEP put a notice in saying

8    these things needed to be done.  So, what did Mr. Walsh do?

9    Absolutely the prudent thing.  Fired them, brought in A.T.

10   Environmental -- or, I'm sorry -- Green Consultants and had

11   the exact same work done.

12             There isn't a point in time when Mr. Walsh didn't

13   do everything in his power to get the parks here today.

14   Again, voluntary reorganization, this was not forced.

15   Mr. Walsh testified he is within two fines of being 100

16   percent current with the DEP.  There's no current

17   violations.

18             Adam Fish's document, which Your Honor is looking

19   at, he has been, continues to this day to manage and test

20   regularly the wastewater facility.  Adam Fish's good work

21   and Mr. Walsh's has brought it within 10,000.  Get the

22   $10,000 done, we're ready, now all we've got to do is pay

23   the engineer to do the part and the City of Ocala is

24   connected.  That's it.

25             There was no possible understanding of anything

1  regarding the wastewater facility that Mr. Walsh didn't

2  accurately and completely explain.  Continuing so, he said

3  it here, even though that goes against him, possibly, the

4  wastewater facility continues to fail.  It's going to

5  happen.  Is today a big day, did everybody have friends

6  over?  Whatever that was, it's going to be excess water and

7  they're going to have to have more trucks brought out

8  there.  That isn't relying on Mr. Walsh.  That has nothing

9  to do with him.

10       And with the current state of the wastewater

11  facility, anyone put in power at this point would have the

12  same problem.  You're going to just have to have new trucks

13  -- more trucks brought in until you're connected.

14       And, Your Honor, there is no understanding of

15  this case and how much work has been done by the collective

16  creditors to think that they don't have eyes and ears

17  everywhere.  How else could we assume that Mr. Hockenberry

18  found out about this and somehow went out on his own to

19  make sure he was a witness here?  It was for one purpose,

20  the eyes and the ears of all the collective creditors were

21  out there talking to everybody.  That's their best hit.

22       They had Mr. Hockenberry here to say he bought a

23  lawnmower for his wife for $450.  The guys there told him

24  it was worth 8,000.

25       We didn't hear from anybody else, we didn't see

1    any other document.  Again, no great thing against

2    Mr. Walsh.  After all these tales, that was it.

3         As to Mr. Craven, he has now filed a proof of

4    claim.  He has joined in, seeking the appointment of a

5    Trustee.  I believe that shows his misunderstanding of the

6    bankruptcy, Your Honor.  If it's liquidated, he gets

7    nothing.  Right now, he is the partner, as Mr. Walsh has

8    testified to, of Mr. Walsh.  He is the 40 percent owner.

9         Mr. Craven had so much confidence in Mr. Walsh

10    that he bought out three -- two or three others who had

11    very small interest in the park, soon after it was formed.

12    Mr. Craven has been given consistent updates.  Mr. Craven

13    was given an order to fund some money and if that had

14    happened, Your Honor, again, it's that same half-million

15    dollars, we probably wouldn't be here today.

16         Your Honor, again, what's undisputed, the parks

17    are open, 31 people have signed on saying, "We will stay,

18    we will pay."  Had it not been for COVID, then, as Mr.

19    Walsh testified in Your Honor's questions to him Monday,

20    Plum Circle would be cash flowing $13,500 a month.

21    Gainesville, 19,000-and-change a month.

22         Add the seven units, let's just say -- let's even

23    cut that in half, let's say $5,500 and you're at

24    25-to-$26,000 a month.  The expenses are nowhere near that,

25    outside of a catastrophe with the wastewater facility.

1          Again, the question has to be:  Who would've

2     done better than that for the last two-and-a-half years?

3     Forgetting all the things I argue on Mr. Baluja, I'm just

4     saying it was business, it didn't work out.  So we all get

5     that, but who would've been able to do better with that?

6     You stick with the person you already have a deal with, you

7     try to make it better.

8          That's what the other witnesses talk about.  They

9     stuck with Mr. Walsh.  Several of them are still partners,

10     including Dr. Scheppke.

11          For Plum Circle, there are no environmental

12     issues.  It does cash flow.  Financing, again, which we put

13     before Your Honor this morning, is in place to pay off

14     everybody.  There were no efforts during this trial to show

15     mismanagement of that park, outside of the 350 which was

16     pledged to protect Gainesville.  Again, that is now taken

17     care of.  Mr. Walsh has made it abundantly clear from the

18     beginning.

19          THE COURT:  Time out.  How was it taken care of?

20          MR. HANCOCK:  With the financing would take care

21     of that 100 percent, this 400,000.

22          THE COURT:  Oh.

23          MR. HANCOCK:  Which would also --

24          THE COURT:  It has not been taken care of yet.

25          MR. HANCOCK:  It's offered to be taken care of.

1          THE COURT:  I see.

2          MR. HANCOCK:  But again, if we take a step back

3     from that, we have Aminam 600,000, that was denied.

4          Mr. Walsh, at a hearing on, I believe, July 9th

5     said, "Judge, I will put the money in the DIP account today

6     if we can just move forward."  Again, that wasn't okayed,

7     so that brought us further to here.  He said it again

8     today.  It isn't an issue of walking away.

9          So for Gainesville Road, Your Honor, in the best

10    interest of everyone, the secured creditors, the unsecured

11    creditors, the City of Chipley, the equity security

12    holders, the tenants of all parks, specifically to

13    Gainesville, if Gainesville closes and the City of Ocala

14    finds out, they will have to close it.  It will mean Adam

15    Fish's contract for ongoing services is done.

16          So unless somebody is stepping in to pay that

17    amount immediately, somebody stepping in to keep in touch

18    with the DEP, and then on top of that to be on signature

19    for the permit, they have to close.  And that won't be a:

20    Here's your 30 days, good luck finding something soon, it

21    will be immediately because the wastewater facility will

22    have to be closed.

23          Even if a Trustee is appointed, Your Honor, this

24    will not protect or save either One Family, or Raj, which

25    again Mr. Anthony has accepted as well.  The Trustee

1    should, and they're obligated, to look at that.

2           All the money, all the time that it cost the

3    Debtors, forgetting Plum Circle, that is why Gainesville

4    Road is here.  If you say Mr. Walsh should've done more,

5    then again, I'm not asking for blame because only Mr. Walsh

6    is here as the Trustee.  If the creditor would've kept his

7    word at any one of three times, then we probably wouldn't

8    be here.

9           The park is currently stabilized.  There are

10   seven units en route; A.T. Environmental, Adam Fish, is in

11   place; $10,000 to get -- to connect to the City.  He makes

12   things work.

13          Again, we might not like it.  Why did we show all

14   27 of the You Tube videos?  Mr. Walsh didn't object at the

15   deposition, I didn't either.  Who cares?  It's not a Tactic

16   video.  It's a businessman trying to get other leads.  He

17   testified to that.  That's his bird dog.  There's nothing

18   wrong with that.  There's nothing even shady or improper

19   about that.  That's what most businesses do.  It's the same

20   as a Google click ad for a law firm.

21          Your Honor, there's a motion for special counsel

22   in place.  The Court has not set that for hearing, has not

23   ruled on it.  That will account for Mr. Baluja and One

24   Family.  It is believed that will account for at least a

25   half-million dollars.  That would bring it to possibly a

net even with the appraised value, offsetting the 400,000

taken off, if the Court would approve the Plum Circle

payout.

The tenants will only stay if Mr. Walsh is in

place.  He is the one they communicate with, he is the one

they contact.  For Mr. Walsh, not for the bankruptcy, not

for the hopes of a Trustee, they signed on to pay with

Mr. Walsh.  That's 31 people that have backed up Mr. Walsh.

No cause exists under 1104(a)(1).  Even if the

Court were to find mistakes, bad mistakes, repeated

mistakes, failure to do this, failure to do that, that

isn't gross mismanagement.  Those are errors.  There's

other case law again that says it just isn't.

Could somebody have done better in that climate

back in 2009?  Could somebody have done better here in over

the last two-and-a-half years?  Unlikely.  Possible.

Would most have done worse?  Would most have

walked away?  Probably, Your Honor, somebody would've put a

for sale sign out front, not invested, not contact.  Again,

if he's the guy with 4,000 doors, do you think he wants to

burn any bridges with those lenders?  Does he want to fail

with them?  No.  He put out there:  I'm in a bankruptcy, I

need your help, and he got it.  He got it immediately.

So part of the analysis the Court has to look at

is:  What does the business community think of Mr. Walsh?

1    We know,  Aminam.  Already there, over half-million

2    dollars.  This other lender today.  And there's various

3    others.  There's Mr. Lustbader --

4              THE COURT:  Where is that in the record?

5              MR. HANCOCK:  Which one, Your Honor?

6              THE COURT:  That all these lenders are clamoring

7    to give money to the Debtor?

8              MR. HANCOCK:  Aminam was a filed motion, Your

9    Honor, the Court's order, we had a full hearing.

10             Mr. Lustbader, those are his personal funds.

11   Mr. Lustbader was the connection to Silver Hill Funding

12   which Mr. Walsh testified to.

13             THE COURT:  That didn't really come in, in the

14   trial.

15             MR. HANCOCK:  The connection for Mr. Lustbader to

16   Silver Hill?

17             THE COURT:  The terms of access to financing.

18             MR. HANCOCK:  All right, Your Honor, I'll move

19   on.

20             1104(a)(2), best interest of any given class, it

21   can't be said that it will better the tenants' position.

22   It can't be said that it will benefit Mr. Craven's

23   position.  He will lose his equity because, as Mr. Anthony

24   has stated, and apparently on behalf of his creditors --

25             THE COURT:  You cannot argue what is in

1    Mr. Craven's best interest.  He has given us, through his

2    lawyer, an indication that he thinks it's in his best

3    interest.  You cannot put your words in his mouth.  He has

4    spoken.

5              MR. HANCOCK:  Sure, Your Honor, I'm not speaking

6    for.  I'm saying my client's position, the Debtors'

7    position of what that means to the park if and when a

8    Trustee is appointed.  That would mean that all equity, all

9    value that Mr. Craven possesses, would immediately be

10   liquidated.  Because the creditors, at some point, have

11   stated they wish to bulldoze the park.

12             Your Honor, as to the relief from stay, there's

13   already adequate protection payments in place.  They have

14   been in place from the outset of both cases.

15             THE COURT:  I'm not going to rule on that and I

16   won't get there unless I deny a Trustee today, because I

17   said that there would be a chance for you all to show the

18   value.

19             MR. HANCOCK:  Thank you, Your Honor.  Okay.  Then

20   that was my final thing.

21             But as to the appraiser, again, we had our

22   appraiser listed timely on Monday.  We also had Ms. Waters

23   listed.  She sat here all Friday but because she wasn't

24   called, she just wasn't available Monday and we discussed

25   she wasn't going to be here today.  So she is in, I

1    believe, approximately a week into her three-week audit.  I

2    don't know who could provide more value to the Court and

3    the Court's decision today.

4              I understand the Court, I think, is going to make

5    a decision today.  But as far as that goes there is no

6    single person or side or party that can make a better

7    picture of the Debtor, accurate, the good, the bad,

8    everything:  He wasted this, he did a great job with this.

9              But, unfortunately, Judge, we just don't have

10   that here today but --

11             THE COURT:  And because she --

12             MR. HANCOCK:  She said she needed three weeks.

13   She's a week into it.  So she was going to be here, Your

14   Honor, to talk about the collective funds of all the

15   entities but would not be able to specifically answer any

16   questions as to the Debtors' practices, but she just needed

17   the additional or the total of three weeks.

18             And, Your Honor, finally again, just to clarify

19   again what Mr. Walsh clearly stated under oath was that he

20   did, in fact, segregate the funds for Fort Bragg and Fort

21   Benning so that can't be any issue otherwise.  The Court

22   will certainly hear Mr. Walsh's testimony.  Thank you, Your

23   Honor.

24             THE COURT:  I think you just heard me point that

25   out.  Okay.  All right.  It's a little bit after 4:30.  You

 1    took less than your 40-minute allotment.  So you all can go

 2    out and come back in, in about 20 minutes or so.

 3                (Recess taken from 4:32 p.m. to 5:03 p.m.)

 4                THE COURT:  Mr. Anthony, when you were reading

 5    from one of the statutes and you emphasized the phrase

 6    "similar case," it's "similar cause," not "case."  Do you

 7    appreciate the difference?

 8                MR. ANTHONY:  "Cause" is right.

 9                THE COURT:  Okay.  Is everybody unmuted?

10                COURTROOM CLERK:  You want everybody to -- you

11    are unmuted in the court but --

12                THE COURT:  Well, I would like to ask a question

13    of some of the people on the phone, so --

14                COURTROOM CLERK:  Okay.

15                THE COURT:  -- particularly Mr. Alexander and Mr.

16    Wheatley.

17                MR. WHEATLEY:  Nathan Wheatley here, Your Honor.

18    What can I do for you?

19                THE COURT:  I'm going to first ask Mr. Alexander

20    if after having heard the closing arguments whether he, on

21    behalf of Mr. Craven, withdraws his support or affirms, on

22    the other hand, his support of the appointment of a

23    Trustee?

24                MR. ALEXANDER:  This is Alexander, Your Honor.

25    I tried to get in touch with my client during the break.

1    I have not been able to get in touch with him -- that's

2    Mr. Craven.  And so in the context where he last supported

3    the appointment of a Trustee, the Court was looking at the

4    dismissal of the case by the U.S. Trustee and it seemed

5    like the three options were dismissal, conversion,

6    appointment of a Trustee, and I supported clearly the

7    appointment of a Trustee because that's what I had

8    discussed with my client.

9           But I've been unable to discuss with him since

10   this last closing argument, his position.  So I apologize,

11   Your Honor.

12          THE COURT:  Okay.

13          MR. ALEXANDER:  I know closing argument is not

14   evidence, but I just wanted to clarify that Mr. Craven did

15   file a proof of claim in the Gainesville case.  It's Claim

16   No. 5.  And the proof of claim deadline has not expired in

17   the Plum case.

18          THE COURT:  Okay.  Thank you.  Mr. Wheatley, do

19   you have anything you want to say?  I didn't give you the

20   opportunity, nor Mr. Alexander to do any kind of closing

21   but it is Mr. Anthony's motion.

22          MR. WHEATLEY:  Nathan Wheatley for the United

23   States Trustee.  Yes, Your Honor.  In fact, I did not have

24   any closing argument to make on behalf of the United States

25   Trustee for the reason that Your Honor cited, the Movants

 1    here are the clients of Mr. Anthony.

 2              The United States Trustee has previously, I

 3    think, made its position clear on the concerns it has in

 4    both cases and in fact brought the motion to dismiss, which

 5    was denied in the Plum Circle case.  And as previously

 6    stated, we believe that there is sufficient evidence in the

 7    docket of the case before Your Honor, both before the trial

 8    and now, to support a determination, if Your Honor decided,

 9    to appoint a Chapter 11 Trustee or to convert the case.

10    Thank you.

11              THE COURT:  All right.  Thank you.  Mr. Craven

12    [sic], can you get a sense from your client whether they

13    would be -- or he would be supportive of leaving the

14    Debtors' management in place versus appointment of a

15    Trustee?  I get that he's onboard for the appointment of a

16    Trustee if the alternatives are conversion or dismissal.

17              MR. ALEXANDER:  Your Honor, I'm calling him.  You

18    said Mr. Craven, but I'm assuming you were directing that

19    to Mr. Alexander.

20              THE COURT:  I'm sorry.  Yes.

21              MR. ALEXANDER:  Okay.  I'm calling him again

22    right now.

23              THE COURT:  Okay.  I'll wait a few minutes.

24              (Pause in the proceedings.)

25              THE COURT:  While he's trying to find his client,

1     while Mr. Alexander is trying to find Mr. Craven,

2     Mr. Hancock, you mentioned that the schedules are complete.

3     Does that mean you've amended the schedule that needed to

4     have all the leases in the second case?

5          MR. HANCOCK:  Your Honor, those were amended

6     weeks ago.  The question that was up in the air that I

7     thought Your Honor would go to pull up -- I don't know how

8     I could pull it up -- was just to find the date.  So we've

9     amended Schedule D for Plum, that was done, is my

10    recollection.

11         We amended Schedule G for Gainesville and it

12    still wasn't everyone based on miscommunication.  So I went

13    back and amended it again to include everybody.

14         Prior to doing that, I went on the Court's

15    website where you just add creditors so everybody got

16    notice because that was Mr. Wheatley's question when he

17    called my office, whichever day he called.  So I

18    immediately did that on that Monday.  So, that part was

19    done and everybody got notice from that point on.  But the

20    Amended Schedule G still needed to be amended in full for,

21    I believe, Gainesville.

22         THE COURT:  Has that been done?

23         MR. HANCOCK:  Yes, Judge.  That was done, I'm not

24    sure.  It was at least two weeks ago.  It was a few weeks

25    ago, whenever we had that hearing and I announced that it

1   was amended.

2           THE COURT:  And did everyone get a notice of the

3   commencement?

4           MR. HANCOCK:  They did, Your Honor.  That was, I

5   believe, posted at the park as well as every person -- and

6   my office now has received calls from a few of the

7   different -- just from the message, wondering what they're

8   supposed to do or what they can do at this point.

9           THE COURT:  Okay.  I didn't check the docket, so

10  that's why I had that as an open issue.

11          MR. HANCOCK:  But just to clarify, if I could one

12  point on that, Your Honor.  At the outset, all tenants had

13  to be notified because that's how they had to change their

14  payment.  They had to put it as the DIP account and --

15          MR. ALEXANDER:  Your Honor, this is Vincent

16  Alexander.

17          THE COURT:  Okay.  Go ahead.

18          MR. ALEXANDER:  I'm not sure how much longer you

19  want to wait, but I have not heard back from him from

20  email.  But I can tell you that prior to the closing

21  argument or hearing about the potential financing, you

22  know, Mr. Craven was in support of a Trustee.  But I don't

23  know if anything that's happened at the hearing has changed

24  that.

25          THE COURT:  All right.  You all, get your pens

1    out.  I'm going to grant the motion and here's why.  I'm

2    going to grant it under both prongs, 1104(a)(1) and

3    1104(a)(2).

4           I recognize that the wastewater treatment plant

5    with regard to Gainesville has been a chronic problem and,

6    in a sense, insoluble problem.  And that is something that

7    is beyond the control of Mr. Walsh.

8           Lack of funding has meant an inability to get it

9    done.  He did get some money from Dr. Scheppke for a very

10   specific purpose and, unfortunately, he had to get the

11   system in shape to even spend Dr. Scheppke's money

12   appropriately, money that he didn't have.  And so when it

13   comes down to Gainesville, the wastewater treatment plant

14   is a big deal.

15          I am not certain as to what has caused Plum's

16   problems based on this record and it could be a mix of

17   things.  But suffice it to say, that entity doesn't have

18   enough cash flow either.

19          Now the causes of the filing that I've just

20   identified or the supposed cause in the Plum case are

21   causes that I think Mr. Walsh isn't directly responsible

22   for.  However, he is the manager of both Debtors.  And when

23   it comes to being a manager, the Bankruptcy Code requires

24   that the management not be guilty of fraud or dishonesty,

25   incompetence or gross mismanagement either before the case

1   or after the case was filed, and that's under (a)(1).

2          And I find that there are some disturbing

3   transactions, compelling to me, that lead to my finding

4   that Mr. Walsh has been -- you can call it "incompetent,"

5   you can call it "fraud," you can call it "dishonesty."  I'm

6   not sure that this record supports a finding of gross

7   mismanagement, but I'll talk about that in the context of

8   record-keeping.

9          The underpinning of my findings, Mr. Walsh, are

10  that there were two transactions that you were involved in

11  that you orchestrated where, basically, we would call that

12  "dealing out of trust."  That's Mr. Austin's situation.

13  You can't collect $19,000 to sell someone something when

14  there's already a lien on it with a contract that says,

15  "You will not transfer any of that collateral."

16          We see this typically with car dealers.  They've

17  got an inventory loan and they're not supposed to sell a

18  particular unit unless they pay off a price -- or release

19  price, in effect, to the floor plan lender.

20          When Mr. Baluja withheld consent to sell those

21  units, you went ahead and did it anyway.  That's selling

22  out trust and it is wrong.  It is dishonest.

23          Now selling or giving someone an option to buy

24  what is unquestionably Mr. Austin's property is fraud.

25  It's dishonest and it's fraudulent.

1              In the floor plan lender situation, selling out

2    of trust, vis-a-vis Mr. Baluja, would also probably be

3    considered fraud.  That was very disturbing, that set of

4    transactions, to me.

5              What was more shocking to me, and more compelling

6    even than that situation, was the Dr. Scheppke situation.

7    Mr. Anthony did not preview these facts in his opening.

8    That's why I was surprised to hear them from Dr. Scheppke

9    on the stand.  You solicited $350,000 from him.  He was in

10   a tight time frame because you were in a tight time frame.

11   And so he agreed, instead of doing a equity deal, he agreed

12   to a convertible note and a mortgage on particular

13   property.  And it wasn't just property of Gainesville.  It

14   was property of other Debtors as well -- other entities as

15   well who probably have their own creditors.  And so none of

16   that is shocking.

17             What is shocking is that you agreed to overnight

18   documents to him on the promise that he would give you the

19   money before he had the original signatures.  And you know,

20   as a skilled investor, that a mortgage has to be recorded

21   in order to get him to the line of priority.  And, instead,

22   you quitclaim deeded the same property that you pledged as

23   collateral to Dr. Scheppke before the mortgage was

24   recorded.  I was astonished that anyone could do that.

25             And not only that, that would just be a wild

deed, probably not so hard to deal with litigation, but
then mortgaged that same property to other lenders.  And
Mr. Hancock said you explained everything.  You never
explained that, not one word of explanation about that.

Now, what about the fact that you had other
borrowers go on that note and pledge their property?  One
of them is Plum.  You took Plum's property to solve the
problems of Gainesville and there's different creditors
afoot as to those properties.  And God knows if they're
creditors of the other debtors.

But what, in effect, you did was create
fraudulent transfers by those debtors by having them sign
the note and backing it with a transfer of an interest in
those borrowers -- or debtors' property for no
consideration.  It may have helped you keep your house of
cards together in terms of the enterprise, and I can see
that.  But, vis-a-vis creditors of these other debtors, it
would have been a fraudulent transfer.

I credit Dr. Scheppke's testimony about how that
mortgage signing went down or, in effect, didn't go down
because he never got the original signatures in time to get
the mortgage recorded ahead of what happened later.  So
those two things together were extraordinarily compelling.

I think that the Fort Benning contracts and their
requirements were very demanding and exacting and very

1     clear. I did a little quick research. If your

2     consolidated group filed an 1120, then you're right, there

3     are no K-1's required. If your consolidated group is an

4     1120S filer, then, yes, the K-1's would be required, even

5     in a real estate trust. That's what my quick down-and-

6     dirty research shows. But the K-1's are not anything that

7     I'm as interested in as the other requirements.

8           You have a Board and you don't have Board

9     meetings. You don't have officers reporting to the Board

10    appropriately because there are no Board meetings. And

11    there are some other contractual requirements in those

12    documents that you did not explain the lack of adherence

13    to, and those are important when it comes to dealing with

14    the equity interest holders who are involved with you as,

15    I'll say, a loosely defined partner. That was problematic

16    to me.

17           Mr. Craven. Mr. Craven is another example of a

18    misrepresentation. You told Mr. Craven that the purchase

19    price was $800,000 for this property and it wasn't and you

20    knew it wasn't. And you didn't call Mr. Craven to disabuse

21    me of that notion and whether he knew the real details

22    before he participated with financing on that. I can draw

23    a negative inference, and adverse inference, that you

24    didn't call him because he didn't know about it before he

25    parted with his money.

1          Going back to the Fort Benning or Fort Bragg, I

2    can't remember which one it was, and whether Dr. Scheppke's

3    money was segregated or kept and not spent, or whether it

4    was spent to rehab the mobile home units at the one where

5    there was condemnation, the burden of proof on that was the

6    movants and they did not prove that the units were not

7    rehabbed.

8          So, on that score, that one goes to you.  It's

9    perfectly possible that you did rehab them and then they

10   were destroyed after the fact, but the movants didn't prove

11   otherwise.

12         About the tracing of the 350, you twice mentioned

13   with firm conviction that you spent $17,000 to get an

14   assessment.  But until this new document came that showed a

15   large lump-sum expenditure of 149,000, or whatever it was,

16   I know that the exhibit didn't come in, but it's curious to

17   me that you would remember the assessment but not the

18   expenditure for hooking up.

19         All in all, though, we don't have documents in

20   the record to show where the tracing -- how I could trace

21   that money to an expenditure not to fix a dilapidated

22   system but, instead, to hook up to the City utilities.  And

23   the reason I don't have those documents is you didn't

24   produce them during discovery.  If they exist, they should

25   have been turned over.  The failure to produce them leads

1    to a negative or adverse inference that whatever you could

2    find would not support your position.

3              Now, could the movants prove that the $350,000

4    was diverted?  They don't have the documents to show that.

5    And the reason they don't have the documents to show that

6    is because they weren't handed over in discovery.  So, I

7    draw an adverse inference there that the evidence would

8    have led to a finding that you did not spend the 350 for

9    the purpose that it was lent.

10             I am going to talk about your credibility now.

11   The video that they played where you're touting your

12   business model is interesting.  I'm not sure it's all that

13   relevant, but I don't feel like you told me the truth about

14   what you meant and the reason is based on the words that

15   you used in the video.

16             You talk about the mobile home parks in the

17   United States and they are underappreciated as investment

18   vehicles, I guess.  And you talk about, if managed

19   correctly, there are still some available for the average

20   investor to buy.

21             I don't know why you felt compelled to add that

22   phraseology in there if all you're asking is them to

23   identify mobile home parks for you to go buy.  And indeed

24   at the end, you say:  I want to tell you more about mobile

25   home parks.

1          Well, your explanation on the stand was, you

2     don't want to tell them anything.  You want the people to

3     call in and tell you something.  You used the word "tell"

4     instead of "talk" for a reason.  I think you were

5     soliciting investors.

6          You talk about:  Once the Wall Street people find

7     out about it, you said, then the game is over.  And this is

8     what you said:  People like you and I, average investors,

9     can't invest.  You're talking to the people as being

10    investors.  This is a solicitation video.

11         And what's even more telling is when I asked you,

12    "What are you going to do for the bird dog," you said,

13    "Well, a commission" and that's fair.  But then you said,

14    "And maybe they'll want to turn their commission into an

15    equity interest or an ownership interest."  That's an

16    investment.  So, I don't think you told me the truth there.

17         I don't think you told me the truth about why the

18    email directive went out for everyone to pay cash.  You did

19    give several explanations and not a single one of them was

20    credible.  If you wanted to make sure that a tenant who had

21    received a three-day notice wouldn't slip in a rent payment

22    to negate the effect of your three-day notice, which would

23    then make you have to redo it again, I mean I get your

24    point, all you had to do was turn off the portal.  Or if

25    you found out about it, that they slipped it in, you could

1    return it.

2         So it doesn't make any business sense whatsoever,

3    if people are used to paying through a portal, for you to

4    turn that off as to everyone else at a time when you need

5    to collect the rents.  You shouldn't make it harder.  You

6    should make it easier for people.  Paying cash.  How do

7    they get the cash?  They've got to go someplace in COVID.

8    That was a tale that I just didn't buy.

9         There were other instances during your testimony

10   where you were evasive, not answering the question

11   directly, non-responsive, in other words, sometimes

12   meandering.  And you have this -- I knew when a story was

13   coming because you always preface it by the "so," giving

14   yourself a little bit of time to think it through.  And

15   then there was a story that had not much to do with the

16   main question.

17        So, in all, I think that, you know, a clever

18   ropeadope and impromptu story telling that are used to

19   avoid a negative answer, it undercut some of the better

20   points that you did have to make.  Fessing up to errors,

21   that might have been a good thing.

22        I agree with Judge Isicoff that mere errors or

23   mistakes are not something that would require the

24   appointment of a Trustee.  And I agree that poor management

25   alone is not enough.

1           But when you have someone in management that has

2      committed one of the four express sins that are set forth

3      in 1104(a)(1) -- and, by the way, 1104(a)(1) includes other

4      things, which I'll get to in a minute -- because of the use

5      of the word "including," which is defined in Section 102 as

6      being non-exhaustive.  When you have one of the four sins

7      demonstrated, the express sins, then we're not talking

8      about poor management alone and the Bankruptcy Code compels

9      me to displace you.

10          Mr. Hancock ably argued that we should look at

11     the cost-benefit analysis.  What are we going to do if

12     you're not there?  You know a lot about your craft.  I

13     think that that can't trump one of the four express sins.

14     And nor does Judge Isicoff's opinion stand for that

15     proposition.

16          With regard to the other cause that the word

17     "including" would encompass are the lack of books and

18     records.  There are cases out there that talk about the

19     lack of backup records, hard copies, et cetera, is grounds

20     for the appointment of a Chapter 11 Trustee.  And it

21     shouldn't be so hard to put together a packet that shows

22     how you spent $350,000 of Dr. Scheppke's money.

23          And I'll cite the case that I'm talking on the

24     record.  It's In re Railyard Company, LLC, 2016 Bankr.

25     Lexis at *39.  It's a bankruptcy decision from New Mexico

1    in 2016, holding that cause exists where the debtor's

2    management lost debtor's computerized business records to a

3    corrupted hard drive and did not keep a backup, could not

4    locate hard copies and made insufficient attempts to

5    recover the lost data.  Whether we're talking about data or

6    hard pieces of paper, that was demonstrated -- or those

7    circumstances were demonstrated here.

8         Let me turn next to 1104(a)(2).  In some sense,

9    the fact that that wastewater treatment plant in

10   Gainesville depends -- if it depends on your staying on

11   that permit, this might be a mistake in terms of my ruling.

12   But I rule that it is also -- in 1104(a)(2), it is another

13   basis for the appointment of Chapter 11 Trustee in this

14   case, because all of the major creditors support the

15   appointment of a Trustee.  They voted against you.  And

16   your partner -- at least as to the last word that we just

17   heard, your partner, in terms of your co-equity interest

18   holder, also believes it's in the best interest to have a

19   Chapter 11 Trustee.

20        I am not making a finding in favor of the movants

21   on the mush pot.  I heard some explanations.  You like the

22   system.  You think it works.  We didn't have a witness come

23   and testify about how it works.  But, given my common

24   experiences I've shared with you all about how that can be

25   done, I know it can be done.  I question doing that if

1    there are different secured creditors involved, but I'm not

2    faulting you for using the "mush pot" platform as you

3    described.  It's so beautiful in fact that that underscored

4    -- your explanation underscored the folly in going to a

5    cash system.

6            I also didn't find in favor of the movants

7    anything to do with Mr. Hockenberry.  Now there's nothing

8    in the record to tell me what this Shawn person looks like

9    or how tall he is.  But Mr. Hockenberry, he was a decent,

10   honest fellow, and I made my findings after he testified.

11   I believe that he believed he dealt with someone named

12   Shawn.  His recitation of thinking that you're on the other

13   end of the phone was hearsay.  It was not anything that I

14   could put credit in.

15           And so the sale of the Toro is not a finding at

16   all, and I don't base this decision on as well the

17   animosity between the Debtors and Mr. Baluja or anybody

18   else that might cause bickering and gridlock is also not a

19   reason that I make this finding.  Just because you have an

20   aggressive creditor who is going to -- or creditors who are

21   going to file many motions and try to press their cause in

22   a way that you might consider aggressive, that's not -- I'm

23   not going to look at that as being grounds for appointment

24   of a Trustee, because that just rewards the well-funded

25   aggressive creditor who would be the, you know, tail

1    wagging the dog on that analysis, and so I'm not going to

2    go there.

3         The value.  I'm not using value one way or the

4    other in these assessments.  The values are kind of all

5    over the place in a way.  Just taking Gainesville, the

6    Debtors' Exhibit 2 says it's worth $755,000.  As you

7    explained, you took that from the Property Appraiser's just

8    value.  The proof of claim filed by one of Mr. Anthony's

9    clients says it's one million.  Mr. Scroggie says it's

10   about a million-and-eight.  At this point, that just

11   doesn't come into play in my decision, in terms of value.

12        The tenants' druthers also don't come into play

13   in my decision.  If the tenants are obligated to pay rent,

14   then they have to pay rent, pure and simple.  Gainesville

15   is the landlord.  Whoever is running Gainesville is not the

16   landlord.  And the tenants will pay or, at one point, they

17   will be kicked out and dispossessed according to Florida

18   law.

19        Now, let me say one more thing before I get to

20   how we go forward in the future.  There better not be one

21   sheet of paper or one computer record that is destroyed

22   between now and Monday, which is the earliest we can get a

23   Chapter 11 Trustee onboard.  Not only would that be

24   spoliation but also it would amount to a bankruptcy crime

25   under 18 U.S.C. Section 152, which prevents the knowing and

1    fraudulent concealing of records or destroying of records.

2    And there's two different subsections in that statute that

3    would apply.

4         So the fact that management will be dispossessed

5    not officially until Monday, but my ruling takes effect

6    today, means that you must ensure, Mr. Caleb [sic], that

7    not one document goes missing.  It's very important that

8    you make sure that everything is kept secure.

9         Now, where do we go, forward?  If you bring in

10   money you buy back these parks, so to speak.  There's no

11   reason you can't go forward with that plan -- the faster

12   the better.  Because a Chapter 11 Trustee and his

13   professionals will, you know, cost some money in terms of

14   their time.  The Trustee's professional, though, is

15   probably a net, you know, neutral regarding a

16   professional's cost because you have one, you know, right

17   there to your left, which there will a replacement of the

18   cast of characters.  But the Chapter 11 Trustee will have

19   his or her own compensation to be paid.

20        And I recognize you're not taking compensation,

21   which is one of the positive things about -- some of the

22   positive things that you did highlight.  And so if you are

23   able to, using your own money or JohnRuth money or O.P.M.,

24   other people's money, who are traditional lenders, if you

25   want to get control of these parks, I say:  Have at it.

1          You will have a duty of cooperation with this

2     Trustee, you, as the primary principal of these Debtors.

3     You will cooperate.

4          And what's more -- and I'm saying this for your

5     benefit -- the attorney-client privilege now will belong to

6     the Chapter 11 Trustee.  So anything that has been

7     discussed with your lawyer or other lawyers who were

8     lawyers for these parks, the Chapter 11 Trustee is entitled

9     to know those things.  And I say this for your benefit,

10    because from now on, anything that you don't want, you know

11    -- strike that.  You should treat Mr. Knox as your personal

12    attorney and I hope he has never represented either park.

13    Okay.

14          One of these cases -- a couple cases, they talk

15    about the materiality of what's at stake here and they talk

16    about dealing even-handedly with insiders or not, vis-a-vis

17    the other creditors, you know, those two factors came into

18    play here.  And so I think it is material to sell something

19    to one person, in violation of the lender's rights, and

20    then turn around and sell it to another person, in

21    violation of the new owner's right.

22          And then I think it is material to misrepresent a

23    purchase price to an investor partner.  And I think it is

24    material to pledge collateral and then turn around and

25    convey the collateral and then encumber it with new

1    lenders.  I think all those are material and they also show

2    an uneven-handed way of dealing with people.

3         So, you do a great job as a salesman.  I think

4    that is your forte.  I think you know a lot about mobile

5    home parks and you are an excellent consultant in that

6    regard when it comes to trying to fix things, because you

7    talked about flipping.  I took that as being a success.  I

8    don't know why Mr. Anthony didn't think it was a success.

9         But, you know, you have some valuable skill sets,

10   but I really think that you use poor judgment in some of

11   your dealings with others in connection with the

12   Gainesville case and that, unfortunately, there are common

13   principals in both of these cases, an act of one of the

14   four major sins in one case means you are imbued with that

15   kind of management persona in the other case.

16        So, I know you're deeply disappointed by the

17   ruling and I hope that you will be able to get your

18   financing together and get it back.  And maybe, you know,

19   going forward in your other deals, because you have other

20   doors, you know, don't play fast and loose.  It doesn't pay

21   off.

22        If Mr. Baluja didn't want to release those units,

23   then, you know what, come into bankruptcy then.  I know you

24   were trying to raise cash by selling them to Mr. Austin.  I

25   know what you were trying to do.  But there are other ways

1     to do that than doing it the way you did it.  And I hope

2     that in the future you won't deal away someone's collateral

3     out from under them.

4           It's better to deal with traditional promissory

5     notes and mortgages than these agreements for deed.  And

6     so, you know, maybe in your future deals, they'll be

7     bullet-proof and above reproach and I hope they are.

8           And I appreciated both counsel's closing

9     arguments and I agree with Mr. Hancock that you do bring a

10    lot of value, but we can't look past those -- especially

11    those three really bad transactions, we can't.

12          And I appreciate, you know, Mr. Anthony created a

13    fairly robust record.  He, in argument, maybe took a little

14    leeway with what I remember the record to be on some of his

15    points and I asked him about those and I think we cleared

16    them up.  And I do you think you did give some explanations

17    but not on the big ticket items.

18          All right.  So now, Mr. Wheatley, could you

19    please unmute and tell me what happens as of this moment?

20    Do you need a written order to get the Chapter 11 Trustee

21    process in play?

22          MR. WHEATLEY:  Thank you, Your Honor.  Nathan

23    Wheatley for the United States Trustee.  And thank you for

24    giving me the opportunity to address this, because I was

25    going to ask the Court for leave to address these very

1    issues.

2         In order to start the process, I do need a order

3    directing the United States Trustee to appoint a Chapter 11

4    Trustee.  Now, I did want to mention, however, that the

5    process of selecting and appointing a Chapter 11 Trustee is

6    going to take a little bit of time.

7         During the pendency of that, it is the position

8    of the United States Trustee's Program that Debtors'

9    current management stays in place and they still have their

10   fiduciary responsibilities to the estate.  They continue to

11   operate the estate for the best interest of all the

12   creditors and to do otherwise is a violation of the Code

13   and Rules.

14        I will be, happily, meeting with the United

15   States Trustee on Monday afternoon actually to pick an

16   Examiner in another case in front of Your Honor.  At that

17   time I will attempt to get information on how soon we can

18   set up the interviews for potential candidates for the

19   Chapter 11 Trustee.

20        After we get done here, the first thing I'm going

21   to be doing is circulating an email to all of the

22   interested parties asking for them to provide me with no

23   more than three potential candidates by the close of

24   business on Tuesday.  I mention that here so that if people

25   want to get their mental wheels running on that now, that

would be helpful.  Because the sooner I get responses from

all of the interested parties, the better.  Even if that

response is to send me a responsive email and say "I have

no candidates to put before the United States Trustee."

     After that, I will talk to the United States

Trustee.  We'll approach the candidates, receive their

information, conduct the interviews and appoint them as

soon as possible.  But I did want to bring that issue up.

Because to the extent that any of the parties are of the

impression that, come Monday, there will be a Chapter 11

Trustee in place, that's not going to be the case.  I,

frankly, would be surprised if there was one by the end of

next week.  And so, again, that's why we expect that

Debtors' current management will continue to operate the

estate for the benefit of the parties.

     I guess the final question, Your Honor, is you

did make some findings of fact.  And for the purposes of

the record, I didn't ask if that would be embodied in a

written opinion or whether that would just be the record of

the case and Your Honor is going to just enter a short

notice of appointment?

     THE COURT:  It would be something short that

would say, "For the reasons stated orally and recorded in

open court, that shall constitute the decision of the

Court."  And that is because the case law instructs that

1    these are to be viewed on a case-by-case basis.  And only

2    if there was a unique fact that the world could learn about

3    ways that you get in trouble if you're management, would I

4    maybe be willing to do something that is more in detail.

5    There's nothing out of the ordinary in terms of a shocking

6    new ground.  I mean there are managers who commit one of the

7    four express sins in 1104(a)(1) and it is what it is.

8         And, oh, by the way, I didn't say it but with

9    regard to the three transactions that I mentioned, the

10   evidence is clear and convincing on that, especially when

11   given the relative credibility of the parties, for sure.

12   And the record-keeping as well, especially buttressed with

13   the adverse inference.

14        MR. WHEATLEY:  And, Your Honor, there is one

15   final point that I neglected to raise.  We still have an

16   outstanding 341 examination that needs to go forward in the

17   Plum Circle case.  We will wait until the Chapter 11

18   Trustee is appointed to reschedule that.  But at that time,

19   it will be expected that Debtor's management will be under

20   oath and providing testimony with regard to that meeting of

21   creditors as well.

22        THE COURT:  Okay.  Well, Mr. Walsh heard you.

23        Mr. Walsh, if you've got some folks that you know

24   who are experts in the industry, besides yourself, you may

25   want to be thinking about those names.  And the fact that

1    we may not have anybody onboard for a week gives you a

2    chance to get with these people that you are negotiating

3    with for loan money, and you may be able to put Plum to bed

4    right away.

5              You know, and frankly with regard to Gainesville,

6    you might want to see a silver lining in that you don't

7    have to deal with that wastewater treatment plant business

8    anymore unless you want to reacquire the park for some

9    reason.  But it could be a blessing in disguise to you,

10   this ruling.

11             All right.  Any questions, Mr. Anthony?

12             MR. ANTHONY:  No, Your Honor.  As far as this

13   order, though, would it make sense for me to take a

14   stab at it, based upon -- I know that you entered one in

15   Delta Tango -- and send whatever I draft to Mr. Hancock and

16   to Mr. Wheatley --

17             THE COURT:  Yes.

18             MR. ANTHONY:  -- so that something can get

19   entered sooner, rather than later?

20             THE COURT:  Yes.  And, you know, it's not easy to

21   listen to things that I said if you're the person who was

22   the one that was sort of on trial, which Mr. Walsh was.  I

23   mean this was an indictment of his management and

24   transactions.

25             And so I'm not interested in, you know, naming

1    names or putting things in there.  This record is a record

2    that is recorded.  It may be part of a transcript.  It

3    could find the light of day if there's an appeal and some

4    more stuff.  The appellate court tends to want to go into

5    more detail and quote the trial court's ruling.  But I

6    think a little short order.

7          MR. ANTHONY:  Very short.  I mean I think Your

8    Honor has obviously put this on the record in order to meet

9    the requirements of Rule 52.  These are findings of fact,

10   conclusions of law, and I don't expect that it's going to

11   be a detailed minutiae.  So, it would be pretty simple.

12         THE COURT:  I think it can just say:  Granted.

13   The United States Trustee is directed to appoint a Chapter

14   11 Trustee.

15         MR. ANTHONY:  Just a whisker more than a jiffy

16   order.  We should be able to do it on Sunday.

17         THE COURT:  Right.  And I hope you both

18   understand why it was that we had to have a trial --

19         MR. ANTHONY:  Yes.

20         THE COURT:  I just couldn't take your word or his

21   word for things.  This was a well-developed record and we

22   had to go through this process.  I'm sorry it was so

23   expensive and time-consuming.

24         I mean, I'm looking to see what could have been,

25   you know, a summary judgment situation.  If the Austin

1    transaction were raised, Mr. Hancock would raise:  You

2    know, I could do it this way or that way justification.

3         MR. ANTHONY:  Well, I think the clients on all

4    sides appreciate -- Mr. Hancock had mentioned it as well --

5    appreciate the Court hearing this on the accelerated

6    schedule that it had.  And there's no way, when you need

7    testimony to do it, except with an evidentiary hearing.

8         THE COURT:  Yes.

9         MR. ANTHONY:  So, I think all of the clients on

10   all sides understand --

11        THE COURT:  Okay.

12        MR. ANTHONY:  -- this is the nature of the beast

13   and it didn't take three years like other cases.

14        THE COURT:  I'm sorry about that one.

15        MR. ANTHONY:  (Laughing.)  Well, they don't

16   happen on this floor.

17        THE COURT:  Oh, well.

18        MR. ANTHONY:  The three-year case is the nature

19   of another type of procedure.

20        THE COURT:  You know, I mean this with all

21   respect to the author, there is a treatise that's a ream of

22   paper if you print it out, it includes all of the -- it's a

23   treatise on avoiding actions and breach of fiduciary duty.

24   And that was an "eight year in the making decision" and

25   sometimes it takes a little bit of time to get things like

1   that on paper.

2            MR. ANTHONY:  Okay.

3            THE COURT:  But we went fast because this is the

4   kind of thing that requires fast.  All right.  Thank you

5   all.

6            I'm sorry that you're going to have a

7   disappointed drive home all on this side of me, my left

8   side.

9            COURTROOM CLERK:  Judge, are you just going to

10  deny the other motions?

11           THE COURT:  What other motions?

12           COURTROOM CLERK:  The cash collateral and motion

13  for order --

14           THE COURT:  No, the cash collateral can continue

15  to be used according to the same budget.  I can take a

16  proposed order on that one.

17           MR. ANTHONY:  Very well, Your Honor.

18           THE COURT:  Do you want to prepare that?

19           MR. HANCOCK:  Actually, I'm not sure, Your Honor,

20  how that would work if at the moment there aren't -- well,

21  there's some rents.  I don't know if there is enough to

22  make the adequate protection, minus Mr. Walsh's bills.

23  That's going to have to be a month-to-month.  And I don't

24  know at this moment there's enough in the -- so I think

25  we'd probably have to stay that, or at least until I get --

1          THE COURT:  No.  I mean it's to the extent that

2     you have cash, you can use -- you conform it to the budget.

3          MR. HANCOCK:  Yeah, that would do it.

4          THE COURT:  Yes, that's fine.

5          MR. HANCOCK:  Sure.

6          THE COURT:  What else?  Motion for stay relief;

7     do you want to withdraw it or do you want to keep it?

8          MR. LAFALCE:  Withdraw.

9          THE COURT:  All right.  Both cases?

10         MR. ANTHONY:  Yes, Your Honor.

11         COURTROOM CLERK:  I thought it was only in the

12    Plum case.  Is it both?

13         MR. ANTHONY:  I'm told by Mr. Lafalce that

14    they're in both, but we want to withdraw --

15         COURTROOM CLERK:  Oh, for an order confirming.

16    Okay.  Great.  Good.

17         THE COURT:  So cash collateral orders, just a

18    little quicky, so you don't have to spend much time.

19         And until there's a Chapter 11 Trustee, you're

20    fees are includable.

21         MR. ANTHONY:  So, my partner is reminding me.

22    There's two stay motions, one for Affordable and one for SN

23    in Plum.  So, that would be a total of three stay motions

24    withdrawn in open court.

25         THE COURT:  Okay.  How about this:  Any stay

1    motions you filed are withdrawn in open court.

2                   MR. ANTHONY:  There you go.

3                   THE COURT:  Okay.  Thank you all.

4                   ATTORNEYS:  Thank you, Your Honor.

5                   THE COURT:  You're welcome.  Bye-bye.

6                   THE COURT:  You all, lawyers, I didn't quote this

7    but in terms of the negative inference, it's the Bicoastal

8    Corp as the one I would have cited, 149 B.R. 212.  All

9    right.  I forgot to say the case name.  All right.

10                  (Whereupon, the hearing concluded at 5:59 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CERTIFICATE

I, Kimberley S. Johnson, Certified Verbatim Reporter Master, hereby certify that the foregoing is the official transcript, prepared to the best degree possible from the digital audio recording and logs provided by the Court.

I further certify that I am neither counsel for, nor related to, nor an employee of any of the parties to the action in which this hearing was taken.

I further certify that I have no personal interest in the outcome of the action.

Dated this 12th day of August, 2020.

_____
Kimberley S. Johnson, CVR-M
Certified Verbatim Reporter Master